No. 29,530.

Maggie Greiner, *Appellant*, v. Frank Greiner, *Appellee*.

(293 Pac. 759.)

Opinion filed December 6, 1930.

*C. A. Walsh, Jr.,* of Concordia, for the appellant.
*R. L. Hamilton,* of Beloit, for the appellee.

The opinion of the court was delivered by

Burch, J.: Maggie Greiner commenced an action of forcible detention against her son, Frank Greiner, to recover possession of a quarter section of land, and an additional tract of eighty acres. Frank answered that his mother had given him the eighty-acre tract under such circumstances that she not only could not reclaim it, but that she should execute a conveyance to him. The district court ordered plaintiff to execute a deed conveying the eighty-acre tract to defendant, and plaintiff appeals.

Peter Greiner died testate, leaving a widow—the plaintiff—and sons and daughters. His sons Henry, Frank and Nicholas, and his daughter Kate, were disinherited—were given five dollars apiece. Henry died in June, 1925, unmarried and intestate, and his mother inherited considerable property from him. She then concluded to place the other two disinherited sons on an equal footing with those

who had been favored in the will, and she took active measures to accomplish her purpose. At first she intended to give Frank and Nicholas land, about ninety acres apiece. Later, she entered into a written contract to pay Nicholas $2,000. Frank had gone to Logan county, had homesteaded a quarter section of land, and had lived there sixteen or seventeen years. Mrs. Greiner lived in Mitchell county, and the land in controversy lies in Mitchell county, not far from her home. The brief for plaintiffs says she inherited from Henry only a three-sevenths interest in the eighty-acre tract. The brief for defendant says she inherited the entire interest, and Mrs. Greiner so testified. In any event, some deeds were to be executed, and in July, 1926, Mrs. Greiner had Nicholas write to Frank and tell Frank to come down, she was going to make settlement with him and Nicholas. Frank came to Mitchell county and had a conversation with his mother. At that time there was a house on the quarter section. In the conversation Mrs. Greiner told Frank she was going to pay him and Nicholas. Frank told her he did not want money, he wanted a home—a little land for a home. She said all right, she had the land, and she wanted him to move into the house, and they would divide up later. He said that would be all right, and he would move back.

Frank went home, but it seems there was an obstacle to his moving. Louis Greiner, one of the sons favored in the will, testified as follows:

"She called me over in 1926, about Frank's matters; . . . She wanted to know if it could be arranged so that she could get that eighty acres there. She told me what she figured on doing; she wanted Frank to move on this eighty, she wanted to give it to him because he was disinherited, and she wanted to equal the thing up for the two boys.

"Q. All right, what did you say to that? A. I said it could be done.

"Q. Yes? A. And the property was divided that way for that purpose.

"Q. Those deeds were made, those deeds that were put in evidence this morning? A. Yes.

"Q. And what, if anything, was said about Frank and this place? A. Well, some time later she called me, and I came up there, and she told me that she wanted Frank to come back that fall, so he could put out wheat, but he had a mortgage on some horses and mules, and he couldn't come. She gave me some money to go out and pay the mortgage off, and I went out and paid the mortgage off, and they moved right back.

"Q. That released his horses and mules, and he came back? A. Yes, sir."

It appears the mortgage was assigned to Mrs. Greiner, and Frank subsequently paid her.

A. Diebolt, cashier of the Home State Bank of Tipton, prepared the contract between Mrs. Greiner and Nicholas. He testified as follows:

"In the summer or fall of 1926 I had a conversation with Maggie Greiner about Frank coming back to Mitchell county. As near as I can say, it was before wheat-sowing time. If I recall correctly, Frank was in the bank with her. The substance of the conversation was that she brought Frank back to Mitchell county, he wasn't doing any good out there, did not have enough to come. I do not know the town, it was in the western part. She said there was plenty of land there; that Frank had been disinherited by his father, and she was going to give him an interest in the land. As I recall, she was going to give him 92 or 97 acres."

Referring to an incident occurring in the fall of 1926, Louis testified as follows:

"At that time I don't remember whether I had a conversation with mother about Frank moving on that eighty, but that was a settled fact at that time, that he was going to move there at that time. Oh, I had several conversations during the year, I was there several times in 1926. I had several conversations with her in the fall of 1926.

"Q. Well, do you remember what she said at any one of those conversations about Frank Greiner? A. Oh, I heard about him moving back, and she gave him that place as his share. . . .

"Q. That eighty acres? A. Yes, sir. . . .

"Q. And did she say why she was going to give him that eighty? A. Yes, sir.

"Q. What did she say? A. Because the rest of us, there were four of them disinherited in the will of my father; he was one of those disinherited."

Frank moved back on September 20, 1926. Mrs. Greiner then determined to move the house from the quarter section to the eighty-acre tract, and give that specific tract to Frank. Frank testified as follows:

"Q. You were asked about what was said about this house, moving this house over onto this eighty, was there any conversation about that, when you had this talk with your mother about moving on this place? A. Yes, sir, there was.

"Q. All right now, I don't think you told regarding that; what was that, please? A. Well, she said we would move that house over there, and the buildings, and said, 'That will be a home for you.'"

Albert Greiner, a son favored in the will, testified as follows:

"Q. I will ask you if at any time you heard your mother say that she had made a contract with Frank Greiner whereby he was to receive that eighty? A. Yes, sir.

"Q. When did you hear her say that? A. I think it was in the fall of '26.

"Q. About what time? A. It must have been the last part of September, somewhere along there.

"Q. That was after he had moved? A. I couldn't say the date exactly.

"Q. What did she say? A. Well, she said she was going to move those buildings over on that eighty for him, for Frank.

"Q. Yes; did she say that she was going to give that place to him, or that she had contracted with him? A. I understood her to say she was going to settle up with Nick and Frank.

"Q. On account of the fact that they had been disinherited by their father? A. Yes, sir."

Flora Greiner, wife of William Greiner, a son favored in the will, testified as follows:

"Maggie Greiner's home is eleven miles from where I live. Until these suits were filed, I saw her often. I had a conversation with her about the time Frank came back in the fall of 1926, regarding this matter. That was at her home. . . .

"Q. What did she say? A. She said Frank's were going to move back here, and said she was going to give him that eighty up there.

"Q. Did she say anything further about it? A. Yes, sir.

"Q. All right, what else? A. She said, 'We are going to move the buildings off of that one hundred sixty, and put them up on that eighty,' and she aimed for Frank to have that for a home."

The buildings were moved from the quarter section to the eighty-acre tract, and Frank commenced to occupy the eighty-acre tract in the spring of 1927. Mrs. Greiner testified as follows:

"I remember of Frank living in Logan county up to 1926. I remember of his coming back that fall, and at different times. He did not then move on this place. He moved on after we had things arranged and the house fixed. I fixed the house and everything, and had it fixed for him. Then he moved on, and has lived there ever since."

The manner of assuring title to Frank came up. At first a will was contemplated. Louis Greiner testified as follows:

"Q. Now did she say anything about this place, any arrangement, after those deeds were made here, and so on? A. Well, we had fixed a date she was going to make a will to that effect, come to Beloit.

"Q. Yes? A. And in the meantime, she had signed some papers with Diebolt to pay Nick $2,000, and she called me up, and wanted me to come up one morning, and told me what she had done.

"Q. Yes? A. Said Gustie had been raising so much storm about it, she wanted me to come and see if I couldn't get that paper back, and she would go to Beloit and make a will in favor of Frank and Nick; and so I went to Tipton with her, and we got this paper, and fixed a date to go to Beloit the next week; and the next week came, and I came there, and she absolutely wouldn't go; wouldn't do a thing.

"Q. Did she say why? A. She said Gustie told her if she would make a will they would move her off the place; that if she would make a will, she would be moved off the place at once.

"Q. Then what was done about this place? A. Well, she said that she would let Frank have it the way it was, and she wouldn't make a will."

Later Mrs. Greiner said she was going to give Frank a deed.

August Greiner, "Gustie," a son favored in the will, lives with his mother. He returned from California a few days after she had made the written contract to pay Nicholas $2,000. The money has not yet been paid. August had a fight with Frank and Albert, and brought an action against them on account of it. He testified he helped move the house from the quarter section to the eighty-acre tract, but he testified he never heard that his mother intended to give the eighty-acre tract to Frank. A crystal gazer could tell why no deed to Frank has been executed.

An omission is noted in the testimony of Louis Greiner quoted above. Louis testified it was a settled fact that Frank was to move on the eighty, and his mother gave him that place as his share. The matter omitted consisted of a single question and answer as follows: "Q. That she was going to give him that? A. Yes, sir." In that way the learned counsel for plaintiff adroitly turned a settled fact into a matter of future intention, and the appeal is based chiefly on that legal distinction. The contention is that Maggie Greiner was going to settle with the disinherited boys; she was going to give Frank land; she was going to give Frank the eighty-acre tract; she was going to move the buildings; she was going to make a will; she was going to give Frank a deed; and these expressions of future intention did not make a contract with Frank that she would give him the eighty-acre tract if he would move from Logan county to Mitchell county.

A promise for breach of which the law gives a remedy, or recognizes as creating a legal duty, is a contract. The promise need not be in any crystallized form of words: "I promise," "I agree," etc. Ritual scrupulousness is not required and, generally, any manifestation, by words or conduct or both, which the promisee is justified in understanding as an expression of intention to make a promise, is sufficient. (Restatement Law of Contracts, Am. Law Inst., §§ 1, 2, 5.) In this instance there is no doubt whatever respecting the intention of Maggie Greiner, either before or after she first sent for Frank to come to Mitchell county. Indeed, she fulfilled her

intention up to the point of the formal matter of executing and delivering a deed. The only question is whether the untutored woman —she could not write—sufficiently expressed a promise to Frank when he came down to see her in response to the letter from Nicholas. The court has no hesitation in saying that Mrs. Greiner did promise to give Frank land for a home if he would move back to Mitchell county. Just at that point the promise was unenforceable because of indefiniteness. No particular land was specified. But the offer was later made perfectly definite. The eighty-acre tract was segregated for Frank, Mrs. Greiner fitted it for his occupancy as a home, and she gave him possession of it. (Restatement Law of Contracts, Am. Law Inst., § 32, *Comment* c.)

Plaintiff says there was no consideration for Maggie Greiner's promise; she did everything for Frank, and he did nothing for her. Section 90 of the American Law Institute's Restatement of the Law of Contracts reads as follows:

"SECTION 90. *Promise Reasonably Inducing Definite and Substantial Action is Binding.* A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance, is binding if injustice can be avoided only by enforcement of the promise."

In this instance Frank did give up his homestead in Logan county, did move to Mitchell county, did establish himself and his family on the eighty-acre tract, made some lasting and valuable improvements upon it, and made other expenditures, relying on his mother's promise; and he lived on the land for nearly a year before he was served with notice to quit.

It is not necessary to review the conflicting evidence in detail. The evidence satisfied the district court that Mrs. Greiner should execute a deed to Frank. On the evidence favorable to him, and the inferences derivable from the evidence favorable to him, this court cannot say it would not be unjust to deny him a deed and to put him off, and cannot say a money judgment would afford him adequate relief.

The judgment of the district court is affirmed.