No. 109,026

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ELLEN BYERS BOUTON,
*Appellant*,

v.

WALTER BYERS,
*Appellee*.

SYLLABUS BY THE COURT

1.

The standards for granting summary judgment and appellate review of those judgments are stated and applied.

2.

Promissory estoppel is an equitable doctrine designed to promote some measure of basic fairness when one party makes a representation or promise in a manner reasonably inducing another party to undertake some obligation or to incur some detriment as a result. Promissory estoppel may be applicable when: (1) a promisor reasonably expects a promisee to act in reliance on the promise; (2) the promisee, in turn, reasonably so acts; and (3) a court's refusal to enforce the promise would countenance a substantial injustice.

3.

Promissory estoppel and contract law are closely related and serve the same fundamental purposes by providing means to enforce one party's legitimate expectations based on the representations of another party.

1

4.

To the extent a promisee relies on equity to specifically enforce a promise or recover damages equivalent to a promised performance, the promise itself must define with sufficient particularity what the promisor was to do. In some circumstances, however, promissory estoppel might permit a remedy compensating the party changing position in reliance on the promise for any detriment or loss incurred notwithstanding a degree of indefiniteness in the promise. A court could fairly determine the remedy without having to parse the promise, since the award would be restitutionary—restoring the promisee, as nearly as possible, to the position he or she had occupied before relying on the promise.

5.

Reasonable reliance under promissory estoppel is a question of fact. In that respect, the indefiniteness of the purported promise becomes a factor in assessing reasonableness for purposes of applying promissory estoppel.

6.

As customarily defined in Kansas caselaw, promissory estoppel requires a promise inducing reliance—there need not be any misrepresentation.

7.

Equity in general and promissory estoppel in particular do not concern themselves with fixing technicalities or trivialities.

8.

The 3-year limitations period in K.S.A. 60-512(1) applies to promissory estoppel claims based on oral promises.

9.

The sale of real property has been subject to the statute of frauds or the requirement for a written memorial of the transaction because a parcel of land is, by its very nature, unique and because land tends to be a particularly valuable commodity, the transfer of which should be marked with solemnity and formality. Courts, therefore, refrain from specifically enforcing oral promises or agreements transferring interests in real property.

10.

The statute of frauds is intended to prevent fraud or injustice, so it may not be invoked as a shield for conduct that would produce injustice. The statute of frauds yields to compelling equitable circumstances. Under the facts of this case developed in the summary judgment record, the statute of frauds would not trump a promissory estoppel claim for restitution.

Appeal from Pottawatomie District Court; JEFFREY R. ELDER, judge. Opinion filed March 14, 2014. Reversed and remanded.

*Robin G. Maxon*, of Maxon Law Office, of Topeka, for appellant.

*Norbert C. Marek, Jr.*, of Westmoreland, and *Russ Roe*, of Wakefield, for appellee.

Before POWELL, P.J., ATCHESON, J., and ERNEST L. JOHNSON, District Judge Retired, assigned.

ATCHESON, J.: This case revolves around a disputed million-dollar promise between father and daughter. Plaintiff Ellen Byers Bouton has appealed on the grounds the Pottawatomie County District Court precipitately entered summary judgment, improperly cutting short her action for equitable relief on the broken promise. We agree. The district court erred in dismissing the promissory estoppel claim Bouton brought

3

against Defendant Walter Byers, her father, for breaching a promise she says he made to bequeath valuable ranchland to her—a promise that induced her to leave the Washburn University faculty so she could help him manage his cattle business. Byers denies ever having made that promise to Bouton and has since sold the land. The record demonstrates disputed issues of material fact precluding the district court's legal conclusion that the promise could not have been reasonably intended or relied upon in the way Bouton suggests. Byers has cross-appealed on various arguments he asserts would otherwise bar Bouton's action. Those arguments also fail at this stage. We, therefore, reverse the judgment and remand to the district court for further proceedings.

SUMMARY JUDGMENT REVIEW, FACTUAL RECORD, AND PROCEDURAL HISTORY

Because the governing standard of review shapes how a district court must look at the evidence on a motion for summary judgment and, in turn, similarly drives appellate consideration of the contested issues, we start there. As the party seeking summary judgment, Byers had the obligation to show, based on appropriate evidentiary materials, there were no disputed issues of material fact and judgment could, therefore, have been entered in his favor as a matter of law. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, Syl. ¶ 2, 308 P.3d 1238 (2013); *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009); *Korytkowski v. City of Ottawa*, 283 Kan. 122, Syl. ¶ 1, 152 P.3d 53 (2007). In essence, the movant argues there is nothing for a jury or a trial judge sitting as factfinder to decide that would make any difference. A factual dispute is material if its resolution would make a difference in how a contested issue must be resolved. *Zimmerman v. Brown*, 49 Kan. App. 2d 143, 149, 306 P.3d 306, *rev. denied* 298 Kan. ___ (October 30, 2013).

As the party opposing summary judgment, Bouton had to point out evidence calling into question one or more material facts presented in support of the motion. See *Shamberg*, 289 Kan. at 900; *Korytkowski*, 283 Kan. 122, Syl. ¶ 1. If the party resisting

4

summary judgment does so, the motion should be denied so a factfinder may resolve those disputes. In addressing a request for summary judgment, the district court must view the evidence most favorably to the party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. *Thoroughbred Assocs.*, 297 Kan. 1193, Syl. ¶ 2; *Shamberg*, 289 Kan. at 900. An appellate court applies the same standards in reviewing the entry of a summary judgment. *Thoroughbred Assocs.*, 297 Kan. 1193, Syl. ¶ 2.

We now look at the facts presented in the summary judgment record in the best light for Bouton, as the party opposing the motion. For purposes of that task, much of the background leading up to the operative events seems to be undisputed and of no direct legal significance to the points on appeal. So we outline that history briefly, recognizing it to be more detailed than our narrative and if recounted at trial almost certainly more contentious. We then focus on the events material to the issues joined on summary judgment and flag the pertinent procedural markers in the district court.

Byers acquired and owned substantial tracts of ranchland through what we understand to be a number of closely held corporations. A tract in Pottawatomie County included what the parties generally refer to as the family ranch where Byers lived. For some time, Byers' son (and, thus, Bouton's brother) managed most of the ranching operations. In 2003, Byers became concerned about his son's conduct and how he was handling some of the business matters entrusted to him. Byers asked Bouton to help in assessing the status of the operations. At the time, Bouton held a tenure-track teaching position on the Washburn University School of Law faculty and earned about $100,000 a year. Bouton's review revealed that her brother had not only mismanaged the business but had embezzled from it. Bouton oversaw civil litigation against her brother to recoup the losses. We also gather he was criminally prosecuted.

Bouton continued to help Byers with the ranching enterprise. She went to the ranch several times a week and wrapped work on her father's business around her teaching duties. In late 2003, Byers showed Bouton a revised will and trust he had prepared leaving the ranch operations to her. According to Bouton, Byers said he wanted her to carry on the ranching business after his death. Byers retained the legal authority to change the testamentary instruments.

During the next 2 years or so, Bouton continued to work at straightening out the financial mess that had enveloped Byers' corporations and the ranching business. Loans had been neglected and had to be refinanced. Taxes had gone delinquent. And other problems had to be dealt with. Bouton found it increasingly difficult to handle both the obligations Byers' businesses imposed and the duties of a law school professor. Again, based on the summary judgment record, Bouton was also concerned about Byers' physical wellbeing. He had suffered a stroke and lived alone on the family ranch. There were also two unoccupied homes on the family place.

In late 2004 and early 2005, Bouton and Byers discussed the situation and the possibility that she and her family might move to the ranch so she could devote more time to the business. Byers encouraged the move, since that would permit Bouton to become involved with the ranching business on a day-to-day basis and would give her direct experience in the quotidian tasks necessary to its success. According to Bouton, she and her husband met with Byers in March 2005 to address more formally how best to accommodate the conflicting demands on her time and energy. Bouton expressed concern about leaving a well-paying and professionally fulfilling job at the law school. Byers reassured her that she needn't worry about money because he was bequeathing her land worth more than a million dollars. In his summary judgment papers, Byers denied that any such meeting happened or that he otherwise made representations of the sort Bouton attributed to him.

6

Bouton, in reliance on Byers' promise that she would inherent the valuable land, resigned from the law school faculty after the spring 2005 semester. She and one of her sons immediately moved to a residence on the family ranch known as Hill House. Bouton's husband and another son followed after selling their home in Osage County. In 2006, the Boutons made significant improvements to Hill House, including an addition. Also in early 2006, Byers sold some of the ranchland. Bouton questioned him about the transaction and how that might affect her inheritance. Byers explained that the proceeds from the sale would be used to pay down debt the remaining corporations owed. In August 2006, Bouton signed the first of a series of employment contracts with Byers for her services in helping run the business and in seeing to some of his personal needs primarily related to medical care and transportation. The contracts called for Bouton to be compensated on an hourly rate and by rent-free occupancy of Hill House. The evidence on summary judgment shows Bouton earned a small fraction of what she had been making as a law professor. The contracts made no mention of Bouton's inheritance of any of the ranchland.

According to Bouton's version of events, the water system on the family ranch froze in December 2008, imperiling the livestock. Byers and Bouton argued about how best to get water to the animals. In her summary judgment response, Bouton asserted that about a week later, Byers told her that her services at the ranch were no longer needed. Bouton stopped doing any work related to the ranching operations the next month, and Byers began charging the Bouton family rent to live in Hill House. The family moved out of Hill House and off the family ranch in mid-2009.

In late 2009, one of the corporations sold ranchland it owned. Byers tendered $32,000 to Bouton, ostensibly reflecting her portion of the corporate income as a 10 percent shareholder in the company. Bouton believed the tender substantially undervalued what she was due. She refused the payment and in April 2010 sued Byers and two of the corporations in Pottawatomie County in an action alleging self-dealing,

breach of fiduciary duty, conversion, and other grounds essentially based on Byers' purported misappropriation of the proceeds from the sale of corporate assets. Bouton and Byers settled that dispute in late December 2010. Byers paid Bouton $60,000 in exchange for a release of claims and a dismissal of the suit. Another individual involved in the sale contributed an additional $10,000 to the settlement and was included in the release Bouton signed.

In August 2010, Bouton returned to the Washburn Law School faculty in a part-time teaching position without any possibility of tenure.

About 14 months later, Byers, through his lawyer, informed Bouton that he had contracted to sell the family ranch—the last of his land holdings except for 10 acres—for $1.2 million. So far as Bouton understood, Byers no longer owned any land that she might inherit. In November 2011, Byers signed a new trust that upon his death would distribute all of his assets to charitable foundations to provide college scholarships. Byers effectively disinherited Bouton.

On December 8, 2011, Bouton filed this action against Byers seeking damages on a promissory estoppel theory in an amount equal to what she would have earned had she continued at Washburn Law School in the full-time, tenure-track position she resigned in 2005. That is, Bouton contends she gave up her teaching position to manage Byers' ranching operation in reliance on his promise she would inherit land worth more than $1 million. Byers answered, denying any liability to Bouton, and counterclaimed for malicious prosecution.

After the parties undertook discovery, Byers filed a motion for summary judgment with a supporting memorandum and evidentiary materials. He asserted an array of grounds supporting judgment in his favor. Bouton duly opposed the motion with a memorandum and additional evidentiary materials. The district court granted the motion,

8

finding the evidence failed to show both a definite promise from Byers and reasonable reliance by Bouton. Bouton has timely appealed. Byers has cross-appealed and presents alternative grounds supporting summary judgment the district court either rejected or declined to consider. We take up the contested summary judgment issues, adding facts as necessary.

LEGAL ANALYSIS

In short, Bouton sued Byers on a promissory estoppel claim after he sold the homeplace and the surrounding land—leaving no property to satisfy the bequest he promised her as an inducement to give up her job as a law professor to oversee the ranching operations. Given the standard of review, we must accept Bouton's assertion that Byers made such a representation, although he denies having done so. Bouton seeks restitution in the form of a monetary award approximating what she would have earned had she never left the law school faculty.

*General Principles of Promissory Estoppel*

Promissory estoppel is an equitable doctrine designed to promote some measure of basic fairness when one party makes a representation or promise in a manner reasonably inducing another party to undertake some obligation or to incur some detriment as a result. The party assuming the obligation or detriment may bring an action for relief should the party making the representation or promise fail to follow through. The Kansas Supreme Court has recognized promissory estoppel to be applicable when: (1) a promisor reasonably expects a promisee to act in reliance on a promise; (2) the promisee, in turn, reasonably so acts; and (3) a court's refusal to enforce the promise would countenance a substantial injustice. *Mohr v. State Bank of Stanley*, 244 Kan. 555, 574, 770 P.2d 466 (1989); *Walker v. Ireton*, 221 Kan. 314, Syl. ¶ 2, 559 P.2d 340 (1977). This court recently restated that formulation of the doctrine. *Byers v. Snyder*, 44 Kan. App. 2d

9

380, 391, 237 P.3d 1258 (2010). The appellate courts' description of promissory estoppel reflects the description in both the Restatement (Second) of Contracts § 90 (1979) and the Restatement of Contracts § 90 (1932). See, *e.g.*, *Ritchie Paving, Inc. v. City of Deerfield*, 275 Kan. 631, 637-38, 640, 67 P.3d 843 (2003) (citing as persuasive California Supreme Court decision relying on Restatement [Second] of Contracts § 90); *Walker*, 221 Kan. at 321-22 (noting Kansas Supreme Court's repeated reliance on Restatement of Contracts § 90). Because promissory estoppel rests on fairness, its application tends to be especially fact driven and, thus, defies any regimented predictive test. See Restatement (Second) of Contracts § 90, comment b (doctrine is "flexible" and "[t]he force of particular factors varies in different types of cases").

Promissory estoppel and contract law are closely related and serve the same fundamental purposes by providing means to enforce one party's legitimate expectations based on the representations of another party. Restatement (Second) of Contracts § 90, comment a (noting the section outlines what is often termed "promissory estoppel" and is conceptually designed to protect legitimate reliance interests). A contract typically depends upon mutual promises that entail an exchange of bargained consideration. *M West, Inc. v. Oak Park Mall,* 44 Kan. App. 2d 35, 49, 234 P.3d 833 (2010) (noting that offer, acceptance, and consideration constitute "all the components of a valid contract"). For example, A agrees to pay B $500 if B overhauls the engine of A's car. If B does the work and A refuses to pay, B may sue for breach of contract, thus enforcing his legitimate expectation. B's promise to work on the engine is consideration for A's promise to pay and vice versa. Promissory estoppel commonly applies when a promise reasonably induces a predictable sort of action but without the more formal mutual consideration found in contracts. Thus, A says he or she will not foreclose the mortgage on B's land for a specified period. So B makes significant improvements to the land. A may not then foreclose during that time. See Restatement (Second) of Contracts § 90, ill. 2.

Kansas courts have explained that a party's *reasonable* reliance on a promise prompting a *reasonable* change in position effectively replaces the bargained for consideration of a formal contract, thereby creating what amounts to a contractual relationship. *Berryman v. Kmoch*, 221 Kan. 304, 307, 559 P.2d 790 (1977); see *Mohr*, 244 Kan. at 481; *Greiner v. Greiner*, 131 Kan. 760, 765, 293 Pac. 759 (1930). To the extent the promisee relies on equity to specifically enforce the promise or recover damages equivalent to the promised performance, the promise itself must define with sufficient particularity what the promisor was to do. See *Owasso Dev. Co. v. Associated Wholesale Grocers, Inc.*, 19 Kan. App. 2d 549, 550-51, 873 P.2d 212, *rev. denied* 255 Kan. 1003 (1994) (suggesting Kansas law requires a promise containing all essential elements). That is a common view. *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 372 (Minn. 1995); *Keil v. Glacier Park, Inc.*, 188 Mont. 455, 462, 614 P.2d 502 (1980) (promise must be "clear and unambiguous in its terms"). The same required specificity governs contracts. *Lessley v. Hardage*, 240 Kan. 72, Syl. ¶ 4, 727 P.2d 440 (1986) ("[F]or an agreement to be binding it must be sufficiently definite as to its terms and requirements to enable a court to determine what acts are to be performed and when performance is complete."). Were the law otherwise, a court might be required to fashion a specific performance remedy from a vague or indefinite promise in an equitable action based on promissory estoppel. The result would be an exercise in impermissible guesstimation.

In some circumstances, however, promissory estoppel might permit a remedy compensating the party changing position in reliance on the promise for any detriment or loss incurred notwithstanding a degree of indefiniteness in the promise. The promisee's reliance would still have to be reasonable, and the promisor would have to reasonably anticipate that reliance. The nature and degree of the indefiniteness could be taken into account in assaying reasonableness. Permitting a restorative remedy would be consistent with protecting reasonable reliance interests, the fundamental purpose of promissory estoppel. A court could fairly determine the remedy without having to parse the promise,

11

since the award would be restitutionary—restoring the promisee, as nearly as possible, to the position he or she had occupied before relying on the promise.

The reasonableness of a party's actions, including reliance on statements of another party, typically reflects a fact question reserved for the factfinder. See *Kincaid v. Dess*, 48 Kan. App. 2d 640, 653-54, 298 P.3d 358 (2013) (reasonableness of home buyer's reliance on representations of seller presented fact question inappropriate for summary judgment); *Schmidt v. Farm Credit Services*, 977 F.2d 511, 516 (10th Cir. 1992) (applying Kansas law, appellate court reverses summary judgment because reasonableness of lender's reliance on representations of corporate borrower as to use of loan proceeds entails a question of fact). Courts treat the requirement of reasonable reliance under promissory estoppel as a question of fact. *Faimon v. Winona State University*, 540 N.W.2d 879, 882 (Minn. App. 1995). In that respect, the indefiniteness of the purported promise becomes a factor in assessing reasonableness for purposes of applying promissory estoppel. *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 214-15, 520 A.2d 217 (1987); see 10 Lord, Williston on Contracts § 27:14 (4th ed. 2011) ("[t]he less clear an agreement, the less likely the plaintiff's reliance will be reasonable and foreseeable, and the less probable will be the injustice from refusing to enforce the agreement").

*District Court's Bases for Granting Summary Judgment*

With those principles in mind, we turn to the district court's bases for granting summary judgment to Byers. First, the district court held as a matter of law that Byers could not have reasonably expected his announcement in 2003 that he had changed his estate plan to leave the ranchland to Bouton to have induced her to resign from the Washburn Law School faculty 2 years later. Even assuming the district court's conclusion to have been legally proper, it didn't address the material facts forming Bouton's promissory estoppel claim. Bouton contends she relied on the oral promise or

12

representation Byers made in March 2005 that she would inherit land worth more than $1 million so she should not worry about the financial impact of leaving the law school faculty. On the summary judgment record, Byers made that statement during a discussion with Bouton and her husband in which they specifically voiced concerns about her resigning that position to work exclusively on ranch business.

In that context, a factfinder could fairly conclude Byers not only might have expected Bouton to act on the promise but intended her to do so. We think that conclusion takes on additional heft in precluding summary judgment because Byers could have changed his estate plan as he wished. Absent the categorical assurance of financial security Byers expressed in March 2005, Bouton would have been walking away from her professorship based on nothing more than a bequest that could have vanished without warning—leaving her jobless and without recourse. On that score, the district court materially misconstrued Bouton's theory of the case and the evidence supporting her theory.

Second, the district court held as a matter of law that Bouton's reliance on the March 2005 promise she attributed to Byers was unreasonable given her "education and the circumstances as a whole." The district court's reference to the overall circumstances, without something more descriptive, is essentially inscrutable. We cannot be guided or persuaded by that kind of unexplained rationale. Our view is otherwise to the extent the record evidence as a whole would allow a factfinder to conclude Bouton reasonably relied on Byers' March 2005 promise that she would inherit property worth at least a $1 million, especially when that representation came in direct response to her trepidation about leaving a job that paid her well. We, of course, are not suggesting that's the conclusion a factfinder ought to reach after hearing the witnesses testify and reviewing the parties' documentary evidence. Rather, we say only that a factfinder would not stray from the realm of the legally supportable in doing so. That is enough to preclude summary judgment.

13

We pause over the district court's reference to Bouton's education. The district court no doubt meant Bouton's legal training and her abilities as a capable and respected law professor. The district court apparently presumed that someone with that background would insist on a legally enforceable written agreement or contract memorializing a promise to transfer land. Most lawyers and law professors—and business executives, for that matter—surely recognize the benefits of written agreements to order their professional and financial affairs. And they would agree with the abstract proposition that oral promises may be difficult to enforce. But none of that translates into a rule depriving members of those groups of claims based on promissory estoppel as a matter of law. The district court's ruling, however, would have it that way.

Reasonableness of reliance is quintessentially a fact question. Bouton's training and expertise do not change it to one that can be decided as a matter of law on this record. The district court's willingness to fashion that sort of a bar seems particularly inappropriate given the familial aspects of the dispute. The parties are father and daughter, not disembodied corporations undertaking a joint venture purely for business advantage. The land promised arguably appeared to be the family ranch rather than some portion of Byers' other real estate holdings. Leading up to the disputed promise, Bouton sought to help Byers at least partly out of a sense of fealty and devotion resting on their blood relationship. In turn, that relationship arguably caused Bouton to leave her sharper legal instincts in the classroom. All of those circumstances ought to be for the factfinder assessing reasonableness in a trial setting rather than on the inanimate summary judgment record of affidavits and deposition excerpts.

Finally, the district court found that the written employment agreements between Byers and Bouton precluded her promissory estoppel claim and cited *Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 1010-11, 974 P.2d 569 (1999), as analogous. Based on the summary judgment record, we cannot agree with that conclusion. The

14

*Fahey* decision is distinguishable. In that case, Fahey moved from Arizona to accept an executive position with the feed yard in July 1992. He and the owners of the feed yard signed a "final supplemental contract" a year later. (It is unclear whether they had a written agreement before then.) The contract provided that the feed yard "contemplated" employing Fahey through 2004, subject to the terms and conditions of the agreement. That contemplation proved unrealistic, and the feed yard terminated Fahey for poor job performance in early 1995. Litigation followed. Fahey argued the feed yard breached the contract and, alternatively, the representation of employment through 2004 could be enforced by promissory estoppel. The court rejected promissory estoppel as inapplicable because Fahey had a contract with the feed yard. So a discrete portion of that agreement could not otherwise be enforced through promissory estoppel. 266 Kan. at 1010-11.

More apt here, perhaps, the parol evidence rule prevents a party to a written contract from attempting to vary its terms by relying on oral representations, be they characterized as negotiations or promises, made in discussions leading up to the agreement. See *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 452, 827 P.2d 24 (1992). A written contract, in most instances, subsumes earlier oral discussions or agreements.

Based on the summary judgment record, the employment agreements do not negate or supersede Byers' representation to Bouton in March 2005. Early on, Byers contracted with Bouton for legal services when she investigated the mismanagement and defalcation besetting the ranching operation. We do not understand the district court to be relying on that agreement. And that avoidance is well advised. The contract predated the March 2005 discussion and was narrowly drawn. But the later employment agreements for Bouton's work at the ranch are also distinct and remote from the disputed promise on which this action rests. Bouton and Byers entered the first of those contracts in mid-2006, a significant period after the promise to bequeath the ranchland.

15

Again, the record, as we must view it, shows Byers made the March 2005 promise in response to Bouton's concern about resigning her law school position at the close of the academic year. About 2 months later, Bouton in fact tendered her resignation. The evidence, thus, establishes the promise and the induced performance were given and completed well before Bouton and Byers agreed to any of the employment contracts covering her services as a manager of the ranching operations. A factfinder fairly could conclude Byers reasonably anticipated Bouton would resign in May 2005, as she did, rather than a year or two later. And Byers was well aware she had already done so at the time they entered into the employment contracts.

Those contracts called for Bouton to receive a relatively low hourly wage for her work plus free rent at Hill House. They make no mention of Bouton's departure from the law school or Byers' promise to bequeath land to her. A plausible conclusion is simply that the parties did not view that promise and Bouton's resignation as having any direct connection to those contracts, let alone forming part of the legal consideration for them. A court would have to draw inferences from the summary judgment record adverse to Bouton to come to any other conclusion, and that would be impermissible. In that regard, Byers, of course, took the position that he never made the March 2005 promise Bouton attributes to him. So Byers couldn't very well argue on summary judgment that he intended the employment contracts to negate or undo something he says didn't happen.

In short, the facts here are unlike those of *Fahey*—Bouton is not attempting to invoke promissory estoppel to enforce some particular provision of one or more of the employment contracts she had with Byers. Nor can we conclude, consistent with the standard of review for summary judgment, those contracts superseded Byers' March 2005 promise to bequeath land to Bouton. The promise and Bouton's resignation from the law school shortly afterward cannot be construed as representations or negotiations undertaken as part of the formation of the employment contracts more than a year later—something that would have to be accepted as true to support the district court's rationale

16

for granting summary judgment. A reasonable factfinder could determine the promise and the resignation to be independent of the later contracts, making summary judgment inappropriate on that basis.

The district court erred in granting summary judgment for the reasons it did.

Byers submits the remaining elements of promissory estoppel on which the district court did not rule support summary judgment. Byers identifies those elements as "substantial detriment" to the promisee and "injustice" resulting from a failure to enforce the promise. We disagree with Byers' assessment. The facts as Bouton portrays them show she left a lucrative job because of Byers' March 2005 promise to bequeath her land worth more than $1 million. And the evidence shows that once Bouton left the tenure-track teaching position, it was lost to her. Given the nature of the job, she could not later return to the law school faculty and simply pick up where she left off. Bouton's compensation for the ranch business came nowhere near her teaching income. All of that reasonably could be considered a substantial detriment to Bouton. In the same vein, we are unwilling to say that enforcement of Byers' March 2005 promise would be something less than just, favoring Bouton with all reasonable inferences from the summary judgment record. That conclusion essentially flows from the other considerations making summary judgment inappropriate—Byers made a promise that reasonably could have induced Bouton to abandon an excellent job to come work at the ranch. Although Byers later became disenchanted with Bouton's handling of the ranch work, justice might fairly be construed to hold him to the inducement he offered to get Bouton to leave her professorship in the first place. In short, the factual record precludes summary judgment based on the other components of promissory estoppel.

17

*Byers' Alternative Grounds for Summary Judgment*

A district court may be affirmed if it reaches the right result for the wrong reason. *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 525, 113 P.3d 241 (2005). Both in the district court and in his cross-appeal, Byers offers alternative legal arguments he contends entitled him to summary judgment on Bouton's promissory estoppel claim. We find those points unavailing and reject them as insufficient to prop up the judgment.

•*Previous Litigation and Its Settlement*

Byers argues that the earlier suit Bouton filed against him for a greater share of the proceeds from the sale of some of the ranchland and the terms of the settlement agreement concluding that action bar the promissory estoppel claim in this case. As we have outlined, Bouton, in the earlier suit, alleged that as a shareholder in the corporation owning the land that had been sold, she should have received a larger share of the proceeds. The suit had nothing to do with Bouton's employment or Byers' March 2005 promise aimed at getting her to change jobs. The claims in that case and this one lack any common legal grounds and share only the most general background facts.

Byers, nonetheless, submits that the rule prohibiting a plaintiff from splitting a cause of action precludes this suit. Basically, the rule requires a plaintiff suffering a legal injury to join all theories of recovery for that harm in a single action against all of the appropriate defendants. *Diederich v. Yarnevich*, 40 Kan. App. 2d 801, 814, 196 P.3d 411 (2008); *Wright v. Brotherhood Bank & Tr. Co.*, 14 Kan. App. 2d 71, 72, 782 P.2d 70 (1989) ("The rule against splitting causes of action requires that all claims arising out of a single wrong be presented in one action."). The plaintiff may not split off some theories of recovery or some defendants in separate suits. *Diederich*, 40 Kan. App. 2d at 814. The rule obviously promotes judicial efficiency and prevents a plaintiff from serially suing defendants for a single legal wrong.

18

The rule, however, doesn't apply here. The earlier suit and this one entail factually and legally distinct harms. Bouton's right to recover in the earlier suit arose from her status as a shareholder in one of Byers' corporations that sold off its assets. That right depended upon the fiduciary relationship between corporate officers and shareholders. See *Richards v. Bryan*, 19 Kan. App. 2d 950, Syl. ¶ 5, 879 P.2d 638 (1994). As we have said, that was factually different from the employment and familial relationship out of which this action arose. Likewise, in the earlier suit, Bouton asserted claims based on breach of fiduciary duty, conversion, and misrepresentation to recover for a legal injury and loss wholly distinct from the promissory estoppel claim. In the earlier case, Bouton sought a fair share of money realized when Byers, as an officer of a corporation in which she owned stock, liquidated its assets. Although the principal asset was ranchland, that property was not essential to fulfilling the March 2005 promise at issue here. In this case, Bouton seeks recompense for Byers' failure to honor a promise he made to her in an individual capacity regarding the bequest of the family ranch. The district court correctly rejected Byers' argument that the two suits impermissibly split a single cause of action.

In a related argument, Byers contends the settlement agreement in the earlier suit bars this action. Under the terms of the settlement agreement, Bouton released Byers and the other defendants for "claims of injury or damages, known or unknown, suffered by her as alleged in [this] Lawsuit." The language limits the release to harm resulting from the distribution of proceeds from the sale of the particular ranchland identified in the petition and owned by the defendant corporation. As we have said, that sale did not include the homeplace or other ranchland that could have been bequeathed to Bouton in conformity with Byers' March 2005 promise. And Bouton asserted no claim or cause of action regarding the promise or the family ranch in the earlier suit, so the release language could not have referred to any such assertion or harm.

19

Settlement agreements are contracts. *Farm Bureau Mut. Ins. Co. v. Progressive Direct Ins. Co.*, 40 Kan. App. 2d 123, Syl. ¶ 7, 190 P.3d 989 (2008). The words of a contract generally should be given their common meaning unless the parties clearly manifest some other intended meaning. *Pfeifer v. Federal Express Corporation*, 297 Kan. 547, 550, 304 P.3d 1226 (2013). The language of the settlement agreement did not include claims outside those related to the distribution of sale proceeds to Bouton as a shareholder. The district court, therefore, appropriately rejected that argument for granting summary judgment to Byers.

•*Requirements for Promissory Estoppel*

Byers argues that proof of some form of misrepresentation is a necessary component or element of a promissory estoppel claim and points out Bouton has offered no such evidence. We disagree with the premise and, therefore, reject the argument. As customarily defined in Kansas caselaw, promissory estoppel requires a promise inducing reliance—there needn't be any misrepresentation. *Mohr*, 244 Kan. at 574; *Walker*, 221 Kan. 314, Syl. ¶ 2; *Byers*, 44 Kan. App. 2d at 391.

Byers, however, suggests a party suing on a promissory estoppel theory must show the promisor misrepresented a material fact or never intended to honor the promise. He incorrectly cites *First Bank of Wakeeney v. Moden*, 235 Kan. 260, 264-65, 681 P.2d 11 (1984), for that proposition. Misrepresentation, however, is an element of equitable estoppel under Kansas law. See *Mutual Life Ins. Co. v. Bernasek*, 235 Kan. 726, 730, 682 P.2d 667 (1984); *Deutsche Bank Nat'l Trust Co. v. Sumner*, 44 Kan. App. 2d 851, 859, 245 P.3d 1057 (2010); *Hershaw v. Farm & City Ins. Co.*, 32 Kan. App. 2d 684, 696, 87 P.3d 360 (2004). In *First Bank of Wakeeney*, a borrower asserted a claim against the bank for equitable estoppel. The court affirmed judgment for the bank because the borrower offered no evidence of misrepresentation. 235 Kan. at 264-65. But in what might be an infelicitous aside, the court also quoted the district court as observing that "'[p]romissory

20

estoppel involves both misrepresentation and detrimental reliance.'" 235 Kan. at 265. The *First Bank of Wakeeney* decision plainly dealt with equitable estoppel, and that is equally plainly what the court discussed on appeal. So, too, the district court, as quoted in the decision, recited the proper elements of equitable estoppel but slapped the wrong label on it.

In the ensuing 30 years, several decisions have mistakenly cited the district court's quote in *First Bank of Wakeeney* as a correct description of promissory estoppel rather than equitable estoppel. See *Benaka v. Aetna Life Ins. and Annuity Co.*, No. 95,982, 2007 WL 1175852, at *3 (Kan. App. 2007) (unpublished decision); *Terra Venture v. JDN Real Estate-Overland Park*, 340 F. Supp. 2d 1189, 1202 (D. Kan. 2004); *Hall v. Associated Intern. Ins. Co.*, No. 11-CV-4013-JTM/DJW, 2011 WL 3299104, at *6 (D. Kan. 2011) (unpublished opinion). Byers cites those cases as precedent supporting his incorrect characterization of promissory estoppel. But those cases aren't so much precedent in the sense of persuasive statements of extant legal authority as they are simply less than fully attentive renditions of a careless statement in an earlier decision.

Along the same line, Byers cites a sentence from *Marker v. Preferred Fire Ins. Co.*, 211 Kan. 427, 435, 506 P.2d 1163 (1973), in which the court affirmed summary judgment for the defendant on a promissory estoppel claim and noted the record contained "no evidence whatsoever of any affirmative inducement or misrepresentation" by the defendant to the plaintiff. The court went on to characterize the exchange between the parties as a "casual request" that the defendant could not have reasonably expected to induce action by the plaintiff or that the plaintiff reasonably should have relied upon. 211 Kan. at 435. So the court analyzed the evidence in light of the settled elements of promissory estoppel. The court did not elaborate on misrepresentation, and the reference ought to be viewed as a rhetorical flourish, not a formal pronouncement of the grounds for promissory estoppel. The *Marker* court cited the Restatement of Contracts § 90 and earlier Kansas decisions relying on the Restatement as fairly outlining promissory

21

estoppel. 211 Kan. at 434. Neither the Restatement of Contracts § 90 nor its successor includes misrepresentation as a necessary component of promissory estoppel.

Confusion also may have been sown by Kansas cases that suggest promissory estoppel be deployed only in the face of conduct that if left unremedied "would be to *virtually* sanction the perpetration of fraud or would result in other injustice." (Emphasis added.) See, *e.g.*, *Berryman v. Kmoch*, 221 Kan. 304, 307, 559 P.2d 790 (1977); *Marker*, 211 Kan. at 434 (same). Other decisions have simply described promissory estoppel as properly invoked to avoid injustice. See, *e.g.*, *Fahey*, 266 Kan at 1010; *Byers*, 44 Kan. App. 2d at 391. The reference to the harm as akin to fraud should be taken as a measure of moral turpitude rather than as a statement of legal rule. That is, the conduct of the promisor must be on a moral plane with fraud, thereby causing an equivalent injustice and permitting an equitable remedy. It is another way of saying that equity in general and promissory estoppel in particular do not concern themselves with fixing technicalities or trivialities. Contrary to Byers' suggestion, however, neither misrepresentation nor fraud is necessary for a viable promissory estoppel claim.

•*Statute of Limitations*

Building on his mistaken argument that promissory estoppel depends upon the promisor's misrepresentations, Byers contends the governing statute of limitations is 2 years, as set out in K.S.A. 60-513(a)(3) for actions based on fraud. He contends Bouton waited too long to file her action and the claim is untimely. We disagree with the argument's foundation and find the 3-year limitations period in K.S.A. 60-512(1) applies. Given that finding, we also conclude that summary judgment could not rest on a statute of limitations defense.

As provided in K.S.A. 60-512(1), "[a]ll actions upon, contracts, obligations or liabilities expressed or implied but not in writing" must be brought within 3 years.

22

Promissory estoppel is rooted in contract law concepts of protecting reliance and expectation interests. See *ATA Airlines, Inc. v. Federal Exp. Corp.*, 665 F.3d 882, 884 (7th Cir. 2011) ("garden-variety" promissory estoppel claim differs from "conventional" breach of contract claim only in that enforcement of the promise rests on "reliance rather than on consideration"); *Peters v. Gilead Sciences, Inc.*, 533 F.3d 594, 599 (7th Cir. 2008) (characterizing promissory estoppel as a "species of contract claim [that] sounds in equity"); *Schulz v. City of Longmont, Colorado*, 465 F.3d 433, 438 n.8 (10th Cir. 2006) (recognizing under Colorado law "'[p]romissory estoppel is an extension of the basic contract principle that one who makes promises must be required to keep them'") (quoting *Patzer v. City of Loveland*, 80 P.3d 908, 912 [Colo. App. 2003]). So the claim would naturally migrate to a limitations period designated for contractual rights. Enforcement of an oral promise by estoppel yields an "obligation" and, therefore, would come within the scope of K.S.A. 60-512(1). Accordingly, Bouton had 3 years to bring her claim based on Byers' conduct negating the March 2005 promise to bequeath her the ranchland worth more than $1 million.

Byers argues he should prevail on summary judgment on an affirmative defense on which he would bear the burden of proof at trial. See K.S.A. 2013 Supp. 60-208(c)(1)(P) (statute of limitations is affirmative defense). In that posture, he must present uncontroverted facts showing Bouton's claim to be untimely. He must do more than assert Bouton cannot prove otherwise. See *Golden v. Den-Mat Corporation*, 47 Kan. App. 2d 450, Syl. ¶ 20, 276 P.3d 773 (2012) ("A defendant moving for summary judgment on an issue on which it would bear the burden of proof at trial, such as an affirmative defense or an avoidance, must establish those facts necessary for a jury to find in the defendant's favor."). The summary judgment record cannot support a judgment for Byers on statute of limitations grounds.

Based on that evidence, the earliest conceivable point Byers could be viewed as acting in a way incompatible with the promise was in December 2008. As represented in

23

Bouton's affidavit, the two argued "in December 2008" about how best to care for the livestock after the water system froze. And "the next week" Byers told Bouton her "help was no longer needed at the ranch," according to the affidavit. That marked a serious rift in their relationship and might have raised questions about Byers' willingness to honor his March 2005 promise. But dismissing Bouton as an employee was not legally or factually tantamount to breaching the promise. We make no determination that Bouton's promissory estoppel claim accrued at that point, only that it could have accrued no earlier. And it may very well have accrued later. See *Engelbrecht v. Herrington*, 101 Kan. 720, 724-25, 172 P. 715 (1917) (On similar facts, the court held that a cause of action on an oral contract to transfer land upon death accrued when the promisor sold the land and could not, as a result, perform his contractual obligation.).

Assuming the freeze happened the first week of December, the conversation between Byers and Bouton would have occurred sometime during the second week of the month. In 2008, the second week began on Sunday, December 7. Bouton filed her promissory estoppel action on December 8, 2011—exactly 3 years after December 7, 2008, for purposes of computing the limitations period. K.S.A. 2013 Supp. 60-206(a)(1)(A) (To compute any time period in Chapter 60 stated in years, thus including statutes of limitation, "[e]xclude the day of the event that triggers the period."). So even giving Byers the benefit of inferences from the record evidence, the reverse of how the issue actually should be analyzed, he could not prevail on a statute of limitations defense on summary judgment. The argument then fails to provide an alternative basis for upholding the judgment for him.[1]

[1]There appears to be a curious dearth of Kansas appellate authority on the statute of limitations applicable to promissory estoppel claims. Neither side cited a controlling case; we have found none. Byers cited *Drexel v. General Motors Corp.*, No. 07-2063, 2009 WL 275682, at *3 (D. Kan. 2009) (unpublished opinion), in which the district court inferred the Kansas courts would apply a 2-year limitations period to the plaintiff's promissory estoppel claim, since it was "based on the underlying allegations of fraud." But the parties in *Drexel* tacitly agreed a 2-year period applied. And from the decision, it

24

is impossible to tell if the claim turned on an alleged misrepresentation and the falsity of the representation. Were that so, the claim might well have been appropriately treated as one for equitable estoppel or as a repackaging of the fraud allegation rather than as promissory estoppel, notwithstanding the plaintiff's labeling of it. Here, Bouton's claim does not rest on a notion that Byers falsely promised to bequeath the land. Rather, the claim seeks to vindicate what Bouton contends was her reasonable reliance on the promise—a theory fully consistent with Byers honestly intending to fulfill the promise and then changing his mind after Bouton resigned her teaching position. Bouton's claim is plainly of the sort described in K.S.A. 60-512(1). A promissory estoppel claim based on a written representation presumably would be governed by a 5-year limitations period. See K.S.A. 60-511(1) (action on "any agreement, contract or promise in writing" must be brought within 5 years).

•*Statute of Frauds*

Byers contends Bouton's promissory estoppel claim is barred by the statute of frauds, K.S.A. 33-106, because the representation entailed the transfer of land. The statute of frauds prohibits an action "upon any contract for the sale of lands" or any related interests "unless the agreement . . . or some memorandum or note thereof, shall be in writing and signed by the party to be charged . . . ." K.S.A. 33-106. For purpose of summary judgment, everyone agrees Byers' promise was never reduced to a writing he signed. The Kansas appellate courts have recognized that the statute of frauds may be applied to promises to bequeath or transfer land upon the death of the owner. See *In re Estate of Spark*, 168 Kan. 270, 278-79, 212 P.2d 369 (1949); *McEnulty v. McEnulty*, 146 Kan. 198, 200-01, 68 P.2d 1105 (1937).

Byers concedes the Kansas appellate courts have also determined that, in some circumstances, promissory estoppel may be invoked to effect the transfer of real property based on oral representations. See *Walker*, 221 Kan. at 321-22; *Greiner v. Greiner*, 131 Kan. 760, 765, 293 Pac. 759 (1930). But he submits those cases involved otherwise fully formed, detailed contracts that failed only because they were not evidenced by a writing satisfying the statute of frauds. And those agreements arose in particular circumstances rendering a refusal to enforce them manifestly unjust. Byers says those circumstances

25

aren't evident here, so the March 2005 promise should be unenforceable. We reject Byers' legal conclusion as a basis for summary judgment.

The sale of real property has been subject to the statute of frauds or the requirement for a written memorial of the transaction for several reasons. First, a parcel of land is, by its very nature, unique—if for no other reason than location, though other attributes commonly differentiate one parcel from another. See *Industrial Maxifreight v. Tenneco Automotive*, 182 F. Supp. 2d 630, 637 (W.D. Mich. 2002); *State, Dept. of Health v. The Mill*, 887 P.2d 993, 1014 (Colo. 1994); *Boys' Clubs of Nashua, Inc. v. Attorney General*, 122 N.H. 325, 326, 444 A.2d 541 (1982). Second, land tends to be a particularly valuable commodity, the transfer of which should be marked with solemnity and formality. *Industrial Maxifreight*, 182 F. Supp. 2d at 637; *Powell v. City of Newton*, 364 N.C. 562, 572-73, 703 S.E.2d 723 (2010) (Martin, J., concurring); *Stickney v. Tullis-Vermillion*, 165 Ohio App. 3d 480, 488, 847 N.E.2d 29 (2006). As a result, courts necessarily pull back from specifically enforcing oral promises or agreements transferring interests in real property. When they do enforce such arrangements, they require the terms to be clear and complete to avoid divesting the promisor of land he or she never contemplated being affected. See *Bank of Alton v. Tanaka*, 247 Kan. 443, 453, 799 P.2d 1029 (1990); *Greiner*, 131 Kan. at 765. In *Greiner*, for example, a series of oral representations between a parent and an adult child regarding transfer of land became enforceable through promissory estoppel to effect that transfer at the point "particular land was specified," making the promise "perfectly definite." 131 Kan. at 765. Similarly, in *In re Estate of Spark*, 168 Kan. at 275-76, the court recognized that an oral agreement to bequeath land had to be "clear and satisfactory" to be specifically enforced.

Byers submits that the purported promise on which Bouton has sued fails that standard and is too indefinite to support a promissory estoppel claim. He says the promise, among other things, didn't strictly refer to an identifiable tract or parcel, only generally to land worth more than $1 million. Nor did the promise allude to any aspects

26

of Bouton's work for the ranching business, such as a starting date or anticipated duration of employment.

As portrayed in the summary judgment record, Byers' promise may have been fairly understood between the parties to refer to the family ranch. Bouton has averred that Byers knew she "always loved the ranch and wanted to live there." According to Bouton, Byers also believed she should live there to best learn about ranching and to continue working on the legal and financial problems that had not been fully resolved. Affording Bouton the especially deferential review of the evidence to which she is entitled at this stage, reasonable inferences would support the conclusion that Byers' promise referred to the family ranch. Based on the record evidence, the homeplace had a value of more than $1 million—corresponding to the amount Byers stated in the promise. Whether the evidence at trial would bear out that inference is another matter.

Even putting that interpretation of the record evidence aside, we find Byers' argument and the legal authority distinguishable. The primary distinction lies in the relief Bouton seeks—a restitutionary award reflecting what she would have earned had she remained on the law school faculty in a full-time, tenure-track position. Bouton never sought specific performance of the promise requiring transfer to her of $1 million in land upon Byers' death. After Byers sold off the homeplace, specific performance would have been a legal impossibility. But that is another matter. The requested relief, however, does not implicate the erroneous deprivation of real property the statute of frauds seeks to prevent. Any lack of detail about the particular land Byers meant to be included in the March 2005 promise doesn't bar a claim for relief apart from specific performance if the promissory estoppel claim is otherwise appropriate.

Moreover, the Kansas appellate courts have long recognized that the statute of frauds is intended to prevent fraud or injustice, so it may not be invoked as a shield for conduct that would produce injustice. *Cooper v. RE-MAX Wyandotte County Real Estate,*

27

*Inc.*, 241 Kan. 281, 291, 736 P.2d 900 (1987); *Walker*, 221 Kan. at 320. In short, the statute of frauds yields to compelling equitable circumstances. Based on the summary judgment record, this would be a case where the statute of frauds would not trump a promissory estoppel claim for restitution in contrast to the transfer of real property.

The Restatement (Second) of Contracts § 90 specifically states relief on a promissory estoppel claim should be tailored to effectuate fair or equitable results. Thus, "[t]he remedy granted for breach [of the promise] may be limited as justice requires." Restatement (Second) of Contracts § 90. The Kansas appellate courts have similarly recognized a right to an alternative equitable remedy, even if specific performance of an oral promise or agreement to transfer land may be inappropriate. *Walker*, 221 Kan. at 323-24; *McEnulty*, 146 Kan. at 203-04. Although the oral contract at issue in *McEnulty* was insufficiently "clear, convincing and conclusive" to warrant specific performance, the district court properly entered an equitable compensatory award of $1,250 for the promisee. 146 Kan. at 203-04. In *Walker*, the court denied specific performance of an oral contract to sell a farm but held the promisee should be allowed to recover expenses associated with the transaction as restitution. 221 Kan. at 323-24; see *Bank of Alton*, 247 Kan. at 453 (oral contract to devise land will not be specifically enforced consistent with statute of frauds if promisee can be fairly compensated in money); *Engelbrecht*, 101 Kan. at 723 (same).

Both the Restatement (Second) of Contracts § 90 and that case authority support a restitutionary award to Bouton if she can otherwise prove her promissory estoppel claim. The statute of frauds would impose a legal impediment only to specific performance of the promise, thereby requiring Byers to transfer land to Bouton. Specific performance is simply not at issue in this case, so we shouldn't be understood as ruling one way or the other on its appropriateness as a remedy or whether the statute of frauds would bar specific performance.

28

We reject the notion that Bouton should be denied a remedy because the specific terms and conditions of her employment at the ranch were not integrated into the March 2005 promise. As we have already said, based on the record evidence, the promise served a purpose quite distinct from setting out the particular terms and conditions of Bouton's work for the ranching enterprise. In context, Bouton had expressed to Byers an inability to do both the ranch work and keep on teaching, and she coupled her concern with an unwillingness to simply walk away from the lucrative professorship. To allay that concern, Byers promised Bouton $1 million upon his death—albeit in the form of the homeplace or some other ranchland—to resign from the law school faculty so she could devote her full time and energy to his business interests and personal needs. The purpose was to induce Bouton to take the necessary step of giving up her teaching job, not to fix the terms and conditions of her employment at the ranch. That those terms and conditions remained indefinite or even undiscussed at all in March 2005 had no bearing on the point of the promise or the action it reasonably might induce and did, in fact, induce when Bouton resigned from the law school faculty less than 2 months later. The absence of any negotiation or agreement in March 2005 on terms of Bouton's employment at the ranch doesn't render Byers' promise so indefinite that the statute of frauds would bar a remedy.

As we have said, Bouton's remedy is tailored to the circumstances of the promise and the particular conduct on her part it reasonably induced—the abandonment of her teaching position. The award Bouton has requested, based on an economist's expert opinion, reflects the net amount she lost by making that decision. While the particular amount may be open to dispute, the general theory of recovery entails restitution placing Bouton in the financial position she would have occupied had she not relied on the promise to her detriment. See *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001) ("'The basic aim of restitution is to place the plaintiff in the same economic position as the plaintiff enjoyed prior to contracting.'") (quoting Calamari & Perillo, The Law of Contracts [§ 15.4 4th ed. 1998]). The Kansas statute of frauds does

29

not impose an impenetrable legal barrier to that sort of restitutionary recovery on an oral promise, even if the promise itself called for the transfer of land.

•*Measure of Damages*

Byers argues that the correct measure of damages for the breach of promise is the value of the services Bouton provided at the ranch. He characterizes the proper remedy as quantum meruit. We reject that argument, since it recasts both Bouton's claim and the factual record.

Bouton and Byers negotiated her duties at the ranch and agreed on a measure of compensation. Those terms and conditions were embodied in their written contracts. Bouton has not claimed or sued on a theory that the compensation was inadequate. In some cases where a person has performed services for another based in part on an oral promise that land would be bequeathed as part of the compensation, the Kansas courts have awarded the actual value of the services provided rather than ordering specific performance and transfer of the property. Byers cites *Bahney v. Gross*, 135 Kan. 446, 449, 10 P.2d 844 (1932), as an example.

But Bouton is not suing on the theory she was promised land valued at more than $1 million as part of the direct compensation for her services to the ranch operations or to Byers personally. Rather, she contends Byers made the promise specifically to induce her to leave her teaching position, thereby freeing her to devote full time to the ranch work. So the measure of damages for breach of that promise wouldn't be the value of Bouton's work at the ranch, which she and Byers set in their contracts, but the financial benefit she forsook by resigning from the law school faculty. Nor do we see how Byers' dissatisfaction with Bouton in December 2008 and his decision to terminate their employment relationship at that point affects the measure of damages. Byers made the promise to get Bouton to quit her job at the law school. She did so. Those circumstances

30

lay the factual and legal basis for the promissory estoppel claim. That Byers specifically wanted Bouton to then come to the ranch to work or that he later changed his mind and didn't want her working there doesn't have a direct bearing on the claim or the damages.[2]

[2]We are not faced with a situation in which the promisee quit after a short time or was fired for dishonesty or some other misfeasance and then sought to enforce the promise for $1 million in land or to obtain some form of restitution. Circumstances of that type could undercut or severely curtail any form of equitable relief. See *Green v. Higgins*, 217 Kan. 217, Syl. ¶ 1, 535 P.2d 446 (1975) ("[N]o person can obtain affirmative relief in equity with respect to a transaction in which he has, himself, been guilty of inequitable conduct."); *Inman v. Inman*, 67 P.3d 655, 659 (Alaska 2003) (recognizing and applying "the maxim that a party must do equity to receive equity").

CONCLUSION

The district court erred in granting summary judgment to Byers. Taking the record evidence favorably to Bouton, a factfinder could conclude she reasonably relied on Byers' March 2005 promise and Byers reasonably could have anticipated that reliance. Byers has not advanced alternative arguments that would support summary judgment in his favor. The record contains disputed facts and credibility determinations that preclude summary judgment and require a trial.

Reversed and remanded for further proceedings.

31