No. 80,452

DECATUR COUNTY FEED YARD, INC., *Appellee/Cross-Appellant*,
v. DANIEL K. FAHEY, *Appellant/Cross-Appellee*.

(974 P.2d 569)

Opinion filed March 5, 1999.

*Alan L. Rupe*, of Morrison & Hecker L.L.P., of Wichita, argued the cause, and *Kelly J. Johnson*, of the same firm, was with him on the briefs for appellant/cross-appellee.

*Eric B. Metz*, of Triplett, Woolf & Garretson, LLC, of Wichita, argued the cause, and *Jeffrey E. Goering*, of the same firm, was with him on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

ALLEGRUCCI, J.: After terminating the employment of its marketing manager, Daniel Fahey, Decatur County Feed Yard (DCFY) filed an action seeking a declaratory judgment that it had not breached its employment contract with him. After learning during discovery that Fahey's résumé was incomplete, DCFY added fraud and negligent misrepresentation claims. Fahey counterclaimed for breach of contract and implied covenant of good faith, fraud, and promissory estoppel. Ruling on cross-motions for summary judgment, the district court concluded that the employment contract had not been breached and that none of the other claims had merit. Fahey appealed. DCFY cross-appealed. The case

was transferred by this court from the Court of Appeals, pursuant to K.S.A. 20-3018(c).

The recitation of facts was given by the district judge on the record after counsel's arguments on their motions for summary judgment. In his prefatory remarks, the judge noted that "there are statements of facts which are agreed upon by the parties." He also referred to "the stipulated facts." In the statements of facts in their appellate briefs, neither party mentions the agreed statements, stipulations, or the judge's summation of facts.

The district judge began his remarks with this snapshot of the procedural history:

"This case began life August 18, 1995, in Decatur County, filed by the plaintiff, seeking declaratory judgment, concerning the issues between the parties as to the contracts. The defendant, Daniel Fahey, moved the matter to federal court claiming diversity of citizenship, added additional claims. The case was referred back to this court on March 7th, 1997, by the federal court, and was found that no diversity existed. At the time the suit was filed and the ERISA claims filed in federal court were dismissed and resolved, and the balance of the pleadings sent back to this court for determination.

"The petition has been amended to claim fraud by silence, fraudulent misrepresentation, negligent misrepresentation claims. The defendant has counterclaimed claiming fraud by silence, fraudulent disclosure, fraudulent misrepresentation, negligent misrepresentation."

The district judge made the following findings of fact before announcing his conclusions on the cross-motions for summary judgment:

"The facts in this case involve the Decatur County Feed Yard, which began existence in 1971. At that time, it grew, in 1977, to approximately 18,000; '95, they increased their capacity again. In 1987, they leased a feed yard in Menlo, Kansas, to in effect increase their feeding operation. That agreement was terminated and the size of the lot again increased in 1992.

"Warren Weibert was the president and manager of Decatur County Feed Yard. In this case, he has held that position since 1977 to date. Then in April of 1992, the Decatur County Feed Yard's marketing manager, Cal Sebring, left and he had been the marketing director at that time for five years prior to that point. In 1992, Daniel Fahey was looking for employment, and through Cattleman's Employment Search in Garden City, Fahey determined that Decatur County Feed Yard was looking for an employee and later determined the position also included marketing manager.

"In May of 1992, the defendant contacted Weibert indicating his interest in employment in Decatur County Feed Yard. It was at this time that he learned there was also a marketing manager position available. On May 12, 1992, the Defendant Fahey faxed to Weibert a copy of his resume, which is attached to the pleadings herein as Exhibit A. The exception noted is the handwriting on there is not the defendant's, that was put on there by Plaintiff Weibert after the resume was received, and pursuant to discussions that he'd had with Mr. Fahey.

"On June 11, 1992, Fahey met with Weibert in Oberlin at the Decatur County Feed Yard, took a tour of the feed yard at that time. During that meeting; Weibert discussed with Fahey and commented he was looking for a ten-year commitment. Fahey testified that Weibert did not elaborate any further on what he discussed with the ten-year commitment and neither did Weibert. Neither party indicated anything additional was stated concerning a ten-year commitment on June 11, 1992.

"During that tour on June 11, 1992, salary and benefits were discussed as the position of marketing manager. Weibert indicated the carrot on the stick was a retirement package in the area of $500,000. Fahey told Weibert he wanted a salary of 52,000 a year. These were the beginning discussions the parties had.

"During the preliminary discussions, Fahey understood that Weibert's expectations of his employment would be that Fahey would be able to take over selling fat cattle, and to sell any of these cattle he could buy and put in inventory, and to solicit business into the yards, and to handle their customers. Fahey understood that increasing the rates of occupancy was an important part of his job, and he understood that he was to increase the rate of occupancy by soliciting customers. This goal was made clear to him at the time that he was hired.

"Before hiring Fahey, both Weibert and Fahey discussed Fahey's job experience and job history in more than one conversation. However, neither Weibert nor anybody else on behalf of Decatur County Feed Yard asked Daniel Fahey if the experience category on his resume was a complete job history. That question was never asked. In Weibert's conversations with Fahey prior to being employed at the Decatur County Feed Yard, Fahey did not disclose any other places of employment, and did not disclose that his employment resume was incomplete.

"Weibert, Warren Weibert hired Fahey based upon the interviews with Fahey, the disclosures he made during that time, and the report which Weibert had requested be made by the SRI Gallup Group, an individual group which did screening for employers at Decatur County Feed Yard. This was both Weibert and his wife relied upon the interviews of Fahey, his resume, and the report, in making the decision to hire Fahey at the time when he began work on July 1 of 1992.

"On July 14, 1993, over a year after Fahey began working in his employment, the final supplemental contract agreement was signed and it was stated as a Supplemental Benefits Plan. That is agreed by the parties, called Exhibit B, it's referred to throughout these pleadings. Prior to the signing of that supplemental agreement plan, Fahey indicated that the employment conditions were, on Page

80 of his deposition, Line 5, that both were to be happy with each other and do a job to make Decatur County Feed Yard grow. On Page 82, Line 19, Fahey testified Weibert wanted the occupancy of the feed yard to grow. And on Page 91, Line 21, the number in the feed yard was to increase.

"At the time they entered into the contract, it was agreed by the parties that it was an employment at will; the two main things Fahey must do were to keep the Weiberts happy, and increase the occupancy on the feed yard. On July 14, 1993, the Supplemental Benefit Plan was signed and agreed upon, they specified retirement dates. . . .

"The key portion is the forfeiture clause; . . . which states:

'Notwithstanding any other provisions of this Agreement, if Executive Fahey is discharged by the company for dishonesty he shall forfeit all of his, his surviving spouse's and descendants' rights to receive any further payments under the provisions of this Agreement. Further, the Executive Fahey while in employment of Decatur County Feed Yard, shall not at any time, either directly or indirectly, accept employment with, render service, assistance or advice to, or allow his name to be used by any competitor of the Company unless approved by the Board of Directors of the Company. Determination by the Board of Directors of such Company that the Executive Fahey has engaged in any such activity shall be binding and conclusive on all parties, and in addition to all other rights and remedies which Company shall have, neither Executive or Beneficiary shall be entitled to any further payments hereunder.'

"With respect to this supplemental payment plan, Fahey did not discuss with Lyle Lessman or Warren Weibert the meaning of the language in the plan that Decatur County Feed Yard could terminate employment at any time for any reason with cause. That was never discussed. Fahey and Weibert never discussed the meaning of any of the terms of the plan after that was signed until after the Weiberts asked for his resignation on January 6, 1995. Fahey estimated in his deposition that when he was hired, Decatur County Feed Yard's occupancy rate was probably at or below the industry average. He admitted that from 1992 to 1994, while he was a marketing manager at Decatur County Feed Yard, the trend in the open occupancy rates were down. Fahey deposition, Page 99, Line 18, stated that in two-and-a-half years that he was the Decatur County Feed Yard marketing manager, Decatur County Feed Yard's occupancy did not increase.

"Fahey acknowledged that Weibert had criticized his failure to sell cattle on a timely basis. Fahey admitted this was a valid criticism, although he explained the circumstances away. Fahey testified that Weibert had concern about the fact that the rate of occupancy was declining, although Fahey believes it was caused by other factors.

"Weibert, along with his wife, Carol Weibert, who's the only other board member of Decatur County Feed Yard, decided on January 6 to ask Fahey to resign. On January 6th, Fahey chose not to resign and they terminated his employment on January 7th, 1995. This lawsuit was filed by the plaintiffs on March 18th, 1995.

"Within a few months after the termination of employment in 1995, Warren Weibert had a series of discussions with William Helming, principal of the corporation called the Helming Group, which is a consulting firm company providing consulting, market analysis and business planning in the agribusiness area. That during that conversation, Warren Weibert determined that Dan Fahey had been terminated from his employment on less than favorable terms; however, the parties reached a settlement in their termination and the record further disclosed there was a letter of recommendation prepared by Helming for Mr. Fahey.

"On Page 98 of Mr. Fahey's deposition, Lines 10 through 12, question: 'Was is [sic] it fair, Mr. Fahey, to say that the trend in occupancy from 1992 to 1994 was down?' Mr. Fahey answered yes. On Page 118, he indicated that was for the two-and-a-half year period."

With regard to the supplemental benefits plan, the district judge made the following findings:

"The contract terms between the plaintiff and defendant prior to July 13th, 1993, was clearly an employment at will; that the defendant could be discharged at any time for any reason, cause or not. After one year, the plaintiffs presented a contract to the defendant, Supplemental Benefits Plan, which provided a series of protections and benefits to the defendant. It, however, did not change the primary function upon which Fahey was hired. Fahey was originally hired to keep the feed yard full and to increase the occupancy rates. What is clear from the 7-13-93 contract is that it changed and put cause in there, and did not require simply an employment at will, and the termination could not be had just simply because they didn't like him. There had to be a reason to terminate him.

. . . .

"The contract did not modify what Fahey's primary function was, and that is to be manager of the feed yard. A feed yard is a private industry business, which requires that it have cattle in it to make money. He was to increase the occupancy rates therein."

Weibert's affidavit contains the following explanation of the decision to terminate Fahey's employment:

"He was ineffective at his job, including soliciting and buying feeder cattle and selling them back to our customers; he did not communicate critical market conditions to our customers at critical times; he was slow to respond to critical situations, especially in terms of selling cattle; and was slow to respond to changing market conditions. He did not make valuable use of his time, and did not succeed in keeping DCFY customers happy nor in keeping me happy in terms of his job performance. Finally, Mr. Fahey did not keep the cattle pens full or make progress in filling DCFY cattle pens, and in fact, the DCFY cattle occupancy during Mr. Fahey's employment headed in a downward trend, and DCFY occupancy was lower than comparable cattle feeding operations during the same time period."

The district court reached the following conclusions of law: (1) DCFY's request for a declaration that it did not breach its contract with Fahey was granted. (2) Summary judgment was granted to Fahey on DCFY's claim that Fahey's résumé constituted fraud. (3) Summary judgment was granted to Fahey on DCFY's additional claims for fraud against Fahey. (4) Summary judgment was granted to DCFY on Fahey's claim that DCFY, by entering into the supplemental benefits agreement, fraudulently induced him to continue his employment. (5) Summary judgment was granted to DCFY on Fahey's claim for wages and benefits under the supplemental benefits agreement. (6) Summary judgment was granted to DCFY on Fahey's claim of promissory estoppel.

At the end of the proceedings, plaintiff's counsel was directed by the district judge to prepare a journal entry. Counsel was told that the findings of fact and conclusions of law that the judge made on the record could be incorporated into the journal entry "by reference." The journal entry states, in part:

"[A]fter hearing the arguments of counsel, and considering the briefs and written submissions of the parties, the court rules from the bench as follows: Defendant's Motion for Summary Judgment regarding plaintiff's affirmative claims for fraud and negligent misrepresentation, as well as plaintiff's affirmative defense to defendant's counterclaims of subsequent acquired knowledge of misconduct, pursuant to *Gassmann v. Evangelical Lutheran Good Samaritan Society, Inc.*, 261 Kan. 725, 933 P.2d 743 (1997), is hereby granted. The transcript of the court's findings of fact and conclusions of law from the bench is incorporated herein as if fully set forth herein.

"As all claims of the parties are disposed of by this Order, this Order constitutes a final judgment as to all claims."

We first consider Fahey's breach of contract counterclaim. Fahey contends that the ruling against him on his breach of contract counterclaim was due to the district court's erroneously using parol evidence in interpreting the supplemental benefits plan agreement (Agreement). "When a contract is complete, unambiguous, and free from uncertainty, parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms, of the contract evidenced by the writing is inadmissible." *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 679-

80, 829 P.2d 884 (1992). It is Fahey's position, and DCFY agrees, that the Agreement is complete and unambiguous.

Whether a contract is ambiguous is a matter of law. *In re Estate of Sanders*, 261 Kan. 176, 181, 929 P.2d 153 (1996). When the court is examining a contract for the purpose of determining whether it is ambiguous, it must give the language "a natural and reasonable interpretation." *Weber v. Tillman*, 259 Kan. 457, 476, 913 P.2d 84 (1996). "As a general rule, if the language of a written instrument is clear and can be carried out as written, there is no room for rules of construction." *Simon*, 250 Kan. at 680. "Regardless of the construction of a written contract made by the trial court, on appeal a contract may be construed and its legal effect determined by the appellate court." *Weber*, 259 Kan. at 476.

Fahey focuses exclusively on ¶ 7 of the Agreement. The " 'cardinal rule of contract construction,' " though, requires the court to construe all provisions together and in harmony rather than in isolation. *In re Cherokee County Revenue Bonds*, 262 Kan. 941, 953, 946 P.2d 83 (1997) (quoting *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 671, 876 P.2d 1362 [1994]).

There are 13 numbered and titled paragraphs in the Agreement and one subparagraph that defines "disability." Paragraphs 2 through 12 govern eventualities or specific aspects of the benefits plan. Those paragraphs are titled Retirement, Disability, Death, Small Amounts, Beneficiary, Forfeiture, Insurance, Unsecured Promise, Arbitration Clause, and Assignment. Paragraph 13, titled Miscellaneous, contains a standard assortment of provisions for amending, revoking, and construing the Agreement.

The subject of ¶ 1 is not eventualities or specific aspects of the benefits plan or construction of the Agreement. It is titled Employment, and it precedes the other paragraphs because it establishes the basis for Fahey's eligibility for the benefits plan:

"Company will employ Executive as Marketing Manager or in such other positions as may be determined from time to time by Company and at such rate of compensation as may be so determined. Executive will devote his full energy, skill and best efforts to the affairs of Company on a substantially full-time basis. It is also contemplated that such employment will continue until December 11, 2004, (Executive normal retirement date of age sixty-five [65]), but nevertheless either

Company or Executive may terminate Executive's employment at any time and for any reason with cause, upon thirty (30) days written notice to the other. The Company's right to terminate the Executive for any reason with cause, may be exercised by the Company's board of Directors as the Board is presently constituted or as it may be constituted from time to time in the future."

As the district court noted, Fahey's first year of employment with DCFY was employment at will. The parties altered his status when they entered into the Agreement so that Fahey's employment could be terminated only with cause.

What constitutes cause is the question raised by Fahey, who argues that cause is defined by ¶ 7. That paragraph provides for forfeiture of payments under the Agreement in the event that Fahey is discharged for dishonesty and prohibits his aiding competitors. Fahey would have the court read ¶ 7 to mean that only dishonesty or disloyalty constitute cause.

The reading advocated by Fahey is unnaturally narrow. First, it effectively nullifies ¶ 1. If ¶ 7 were construed to define cause as dishonesty or disloyalty, the provision of ¶ 1 that establishes that Fahey's employment can be terminated "for any reason with cause" would be rendered meaningless. The Agreement changed Fahey's status from that of an employee-at-will to one whose termination required some cause, but it did not guarantee his employment short of dishonesty or disloyalty. Second, Fahey's reading negates the harmonious relationship among the paragraphs of the Agreement. Paragraphs subsequent to ¶ 1 provide benefits to Fahey and his family as a result of his employment by DCFY, some benefits even surviving termination of his employment. Paragraph 7 is the proviso that would cut off benefits if Fahey were dishonest or disloyal. It is the *limitation on benefits* rather than the definition of cause for termination.

The Agreement is complete and unambiguous and provides that Fahey's employment was terminable for any cause. It was not necessary for the district court to resort to parol evidence in reaching its conclusion that Fahey was terminated for cause within the meaning of the contract. Nor does it appear that the district court did so. Because the Agreement plainly provides that Fahey's termination may be "for any reason with cause," it would only be

when cause is too narrowly defined, as in Fahey's erroneous construction, that cause for his termination could not be found within the four corners of the contract.

Fahey's fallback position is that the entry of summary judgment on his breach of contract counterclaim was improper because there are genuine issues of material fact. In this regard, he makes several arguments.

First, he contends that his "understanding of his contractual rights under the written Agreement is at odds with DCFY's" and that the reasons given by DCFY for his termination were false. A contract is the written embodiment of the parties' intent, and construction of the contract is a matter of law. Differing interpretations of a contract's provisions where, as here, the contract is complete and unambiguous do not present issues of fact.

The second contention, too, is flawed. Fahey argues that "application of the *Weir* test to the facts of this case demonstrates that genuine issues of material fact exist for trial." He refers to *Weir v. Anaconda Co.*, 773 F.2d 1073 (10th Cir. 1985) (applying Kansas law). Here, the district judge used the definition of "cause" from *Weir*:

"[Cause for discharge] is a shortcoming in performance which is detrimental to the discipline or efficiency of the employer. Incompetency or inefficiency or some other cause within the control of the employee which prohibits him from properly completing his task is also included within the definition. A discharge for cause is one which is not arbitrary or capricious, nor is it unjustified or discriminatory." 773 F.2d at 1080.

On a motion for summary judgment, the trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the nonmoving party but, in opposing the motion, that party "must come forward with evidence to establish a dispute as to a material fact." *Saliba v. Union Pacific R.R. Co.*, 264 Kan. 128, 131, 955 P.2d 1189 (1998). Here, the district court credited DCFY's evidence, Weibert's affidavit, previously quoted herein.

Fahey conceded that the number of cattle occupying the feed yard actually decreased during his tenure. Fahey, however, submitted an affidavit in which he chronicled his diligent efforts to

make DCFY succeed and swore that circumstances beyond his control adversely affected its profitability. He relies on the definition of cause in *Weir* for the proposition that the product of circumstances outside his control "cannot be considered 'cause' for terminating his employment." A reasonable reading of *Weir*, however, does not necessarily support Fahey's construction. The federal court broadly defined cause for termination as a shortcoming in the employee's performance that is detrimental to the employer and added that the definition included "[i]ncompetency or inefficiency or some other cause within the control of the employee which prohibits him from properly completing his task." 773 F.2d at 1080. Fahey would apply "within the control of the employee" to the entire category rather than limiting it to the "some other cause[s]" included within the definition. He cites no support for his construction in Kansas law, nor has any come to the court's attention. The federal court referred to a definition set out by this court in *Gillett v. U.S.D. No. 276*, 227 Kan. 71, 78, 605 P.2d 105 (1980):

"[A] tenured teacher may be terminated or nonrenewed only if good cause is shown, including any ground which is put forward by the school board in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the school board's task of building up and maintaining an efficient school system."

In this definition, the emphasis is on reasonableness. Determination of reasonableness might include consideration of external factors that hampered the employee's performance, but no cases have come to our attention in which that specific question was adjudicated. Assuming for the purpose of discussion that matters outside the employee's control can constitute circumstances extenuating his shortcomings and, thus, casting doubt on the sufficiency of the employer's stated reasons for termination, it would be up to the employee to furnish proof of the external matters. In the present case, Fahey countered Weibert's stated reasons for the termination with his own affidavit, his own deposition testimony, and Weibert's deposition testimony. Weibert testified:

"Q. What factors [affect] the ability to fill a feed yard in your experience?
"A. There are a lot of factors.

"Q. Kind of go through them.

"A. Weather is a factor. The price of feeder cattle is a factor. The price of grain is a factor. The price of fat cattle is a factor. Having a good reputation is a factor. Having good production numbers is a factor. Having good personnel is a factor. Presenting a good image is a factor. And I am sure there are many, many other factors.

"Q. Competition a factor?

"A. Of filling a feed lot?

"Q. Yeah.

"A. It could be, yes.

"Q. Market conditions a factor?

"A. It is possible. There are a lot of feed lots in the country. There is a lot of cattle in the country. And you can still have full feed lots in all market conditions."

Weibert's testimony is that the external factors possibly could affect occupancy of a feed yard. Fahey's sworn testimony is that weather, season, market conditions, grain prices, and competition adversely affected his efforts to fill DCFY with cattle. He offers further proof that the low occupancy rates were due to circumstances beyond his control in Weibert's deposition testimony that the overall rates continued to decline after Fahey's departure through summer 1996. During that period, Weibert solicited customers. Weibert attributed the decline to factors, including market conditions, other than his performance.

Other evidence Fahey points to in disputing DCFY's position that he was ineffective as marketing manager are his satisfactory performance evaluation and 5% raise in salary of June 1993 and execution of the Agreement in July 1993. In *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 872 P.2d 252 (1994), a discharged employee argued that her increases in pay and responsibilities and absence of negative evaluations established that her work performance had been satisfactory. She further argued that they "created an implied contract of continuing employment over and above the written contract," which had allowed termination at will. 255 Kan. at 174. The court dismissed the notion with the following: "The mere fact that an employee has not been previously terminated under written contractual employment-at-will provisions does not create an implied contract for continuing employment." 255 Kan. at 174. In this case, Fahey already has the contract that requires

cause for termination, and he is arguing that his satisfactory evaluation and pay increase establish lack of cause. He cites no authority for the proposition.

Finally, Fahey contends that he presented substantial evidence of DCFY's lack of good faith and fair dealing. He refers to the price of feed at DCFY and Weibert's veto of some ideas floated by Fahey. In *Bonanza, Inc. v. McLean,* 242 Kan. 209, 222, 747 P.2d 792 (1987), the court discussed a duty of good faith and fair dealing that precludes parties to a contract from intentionally blocking each other's performance. *Bonanza* involved a lease agreement. Fahey has not provided the court with a model for application of the duty to an employment contract. Nor does Fahey seem to have come forward with any evidence that would indicate that Weibert was doing anything other than exercising his business judgment. Fahey has provided no authority for the proposition that Weibert's doing so would constitute bad faith or unfair dealing to prevent Fahey from performing.

The district court also concluded that Fahey's promissory estoppel claim was "waived, because there was cause for termination." In other words, the district court declined to enforce DCFY's promise to employ Fahey until December 2004 because the promise was contingent on Fahey's performance satisfying DCFY, and his performance did not.

Fahey contends that cause for termination is irrelevant. He argues that DCFY is obligated to keep its promise to employ him until December 2004, as stated in ¶ 1 of the Agreement, because, as DCFY expected, in reliance on the promise of long-term employment Fahey moved his family to Kansas from Arizona, bought a house, and renovated it. For some time, the courts of this state have applied the rule set forth in Restatement (Second) of Contracts § 90 (1979): "A promise which the promisor should reasonably expect to induce action . . . on the part of the promisee and which does induce such action . . . is binding if injustice can be avoided only by enforcement of the promise." *Kirkpatrick v. Seneca National Bank,* 213 Kan. 61, 67-68, 515 P.2d 781 (1973). This is the principle upon which Fahey relies, but it has no application in the circumstances of the present case.

Promissory estoppel developed as a substitute for consideration, which allowed a court to enforce an otherwise unenforceable promise. For example, in *Greiner v. Greiner*, 131 Kan. 760, 293 Pac. 759 (1930), the court enforced a mother's promise to provide one of her sons with a parcel of land even though there was no consideration for her promise. Relying on his mother's promise, the son had given up his homestead in Logan County, moved himself and his family to Mitchell County, established himself and his family on the promised tract, and made valuable improvements. The district court decided that the mother should execute a deed to the son, and this court affirmed, stating: "[T]his court cannot say it would not be unjust to deny him a deed and to put him off, and cannot say a money judgment would afford him adequate relief." 131 Kan. at 765.

Fahey cites a more recent case, *Mohr v. State Bank of Stanley*, 244 Kan. 555, 770 P.2d 466 (1989). There, too, the court indicated that the doctrine of promissory estoppel is a substitute for consideration. 244 Kan. at 574. Here, there was an agreement supported by consideration on either side, and both parties had performed under the agreement for some period of time. Promissory estoppel is not applicable to the circumstances in the present case.

Although waiver would seem to be an unrelated concept, the district court's conclusion appears to have been correct. " 'A district court's reasons for its decision are immaterial if the ruling was correct for any reason.' " *Stone v. City of Kiowa*, 263 Kan. 502, 516, 950 P.2d 1305 (1997) (quoting *Dickerson v. Kansas Dept. of Revenue*, 253 Kan. 843, Syl. ¶ 3, 863 P.2d 364 [1993]).

In view of the foregoing, we need not consider other arguments asserted by appellant or to consider the cross-appeal of appellee.

The judgment of the district court is affirmed.