NOT DESIGNATED FOR PUBLICATION

No. 113,996

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DE ANNA MERRILL,
*Appellee*,

v.

GEORGIA PACIFIC
and
INDEMNITY INSURANCE CO. OF N.A.,
*Appellants.*

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed June 10, 2016. Affirmed.

*Nathan D. Burghart* and *Carissa A. Heim*, of Burghart Law, LLC, of Lawrence, for appellants.

*John J. Bryan*, of Bryan, Lykins, Hejtmanek, P.A., of Topeka, for appellee.

Before GREEN, P.J., BUSER, J., and HEBERT, S.J.

*Per Curiam*: In this workers compensation appeal, Georgia Pacific contends the Workers Compensation Board (Board) erred when it determined that its former employee, De Anna Merrill, was entitled to permanent partial disability benefits in excess of her functional impairment. After carefully reviewing the parties' briefs and the record on appeal, we find that substantial competent evidence supports the Board's finding that Merrill was eligible to receive a work disability award.

1

FACTUAL AND PROCEDURAL BACKGROUND

On October 17, 2011, Merrill began working for Georgia Pacific as a sacker in a gypsum mine in Blue Rapids, Kansas. At the mine, the company converted gypsum ore into products ranging from dental plaster to subflooring. Later, Merrill's duties included mixing and cooking "dirty rock" (gypsum that had other components in it) in large autoclaves. Lastly, Merrill worked as an Ultra operator.

As an Ultra operator, Merrill cooked "clean rock" (very white gypsum) in autoclaves and, once cooked, she used an overhead hoist to move the gypsum into baskets that were placed in a dryer. After drying, Merrill guided the gypsum through "a series of tubes, screws and air tubes" into a hammer mill or screw mill where the gypsum was pulverized into a dust. The product then went into a hopper where it was sifted by screens.

Merrill was injured on December 18, 2012. On that date, a 40-pound bolus of gypsum struck her "full force in the face." Because of the incident, Merrill inhaled some gypsum. Employees used an air hose to blow the gypsum dust off of Merrill, and she washed her face and hands. Merrill informed the plant foreman and safety manager that her "lungs were burning really bad," but they declined her request for medical assistance and told her to finish her shift. A couple of days later, Merrill was still having difficulty breathing and her lips were turning blue, so she went to the emergency room, where she was given IV medications and breathing treatments.

On January 15, 2013, Merrill was evaluated by Dr. Gerald R. Kerby. Dr. Kerby diagnosed Merrill with irritant-induced asthma from exposure to gypsum dust. Dr. Kerby also opined that Merrill had "an element of bronchitis . . . which [was] probably related to her untreated asthma." As a result, Dr. Kerby prescribed several medications and recommended that Merrill either refrain from work or remain in a nondusty area for 4

2

days "to give the medication a chance to improve her current asthma and bronchitis symptoms."

Upon Merrill's return to Georgia Pacific, she performed her regular jobs duties with the use of a dust mask. According to Merrill, however, completing her assigned tasks was "difficult [and] very painful" and she had to move "real slow" and stop multiple times when climbing stairs because she "couldn't breathe."

Merrill filed an application for workers compensation on February 4, 2014. Georgia Pacific appointed Dr. William M. Leeds—a board certified specialist in internal medicine, diseases of the chest, and intensive care medicine—as the authorized treating physician. Dr. Leeds diagnosed Merrill with irritant-induced asthma, or reactive airway dysfunction syndrome (RADS), and opined that she would need "chronic treatment most likely [for] the rest of her life." Dr. Leeds imposed the following work restrictions: "[S]tay away from dust, fumes, chemicals, animal dander, [and] avoid extremes of temperature and humidity." Dr. Leeds assessed Merrill with a whole person impairment of 25%.

On February 12, 2014, Dr. Thomas Beller, a board-certified specialist in internal medicine with a subspecialty in pulmonary medicine, completed an independent medical examination of Merrill at the request of Georgia Pacific. Similar to Dr. Leeds, Dr. Beller diagnosed Merrill with RADS caused by a work-related exposure to gypsum, and he recommended work restrictions which included avoiding "exposure to fumes, dust, smoke and respiratory irritants as much as possible." Dr. Beller assessed Merrill with a 10% whole person impairment.

Georgia Pacific terminated Merrill on February 5, 2013, the day after she filed her workers compensation claim. She was terminated for leaving a shift early, failing to

properly shut down equipment, dishonesty, and poor job performance. The primary reasons for Merrill's termination derived from a workplace incident.

Merrill testified that about 2 a.m. on February 3, 2013, some of the equipment she had been using began to malfunction. Merrill contacted Tobby Oatney, whom she described as the "on-call foreman/manager," at home and advised him of the situation. Oatney dispatched a mechanic who resolved the problems, whereupon Merrill called Oatney to let him know that the equipment was functioning. During this conversation Oatney asked Merrill when she would be going on "all pause"; and after Merrill told him about 4 a.m., Oatney stated that "if anything breaks down after 2AM don't call [me], just shut it down."

At about 3:40 a.m., an alarm on one of the autoclaves sounded indicating there was high pressure, but Merrill noted there was no high pressure in the machine. Merrill's attempts to disable the alarm were unsuccessful, and when she tried to reclose the lid on the autoclave, "material started coming out of the overflow for the [r]eheater." Merrill "shut the appropriate machinery down" and contacted Oatney, who instructed her to "'[s]hut it down and go home.'" Merrill informed Oatney that the alarm was sounding and would not shut off. In response, Oatney stated, "'[T]hat's fine. Leave it alone and just shut everything down." Merrill testified, "[Oatney] specifically told me to shut the equipment down and go home. He told me that several times. He told me that two or three times each time I called him."

In keeping with Oatney's instructions, Merrill attempted to shut down the equipment but because it was broken she was unable to properly turn off some of the equipment. While some autoclaves, dryers, and oil burners were left operating to some degree, Merrill took precautions to ensure this equipment would not be further damaged.

Merrill advised Oatney of the manner in which she shut down the equipment, and according to her, Oatney replied, "'That's fine, just go home and we will be in in the morning and get it fixed.'" Merrill advised Oatney that she would leave him a note explaining "what [she] had done and what the issues were" and then go home. Merrill left Oatney a note, and before leaving, she told the Densite operator "what was going on and that [Oatney] had told [her] to go ahead and shut it down, that [she] had shut it down to the best of [her] ability, and that [she] was going home."

In the workers compensation proceedings, Merrill testified that Georgia Pacific never provided her a hearing or an opportunity to present her side of the story prior to her termination. In fact, according to Merrill, on the day she was terminated, James Mullins, the human resources manager, called her to his office and stated, "'[W]e[']re not going to spend much time on this. You are being terminated for 'poor workmanship and improperly shutting equipment down.'"

On the other hand, Mullins testified that Merrill's position as an Ultra operator was under the authority of the production department, overseen by the production supervisor. Mullins maintained that when a production employee encounters malfunctioning equipment, the proper procedure would be to contact the production supervisor to seek further guidance. If the employee believes it is not safe to leave the equipment in operation, he or she may follow the posted shutdown procedure and remain with the equipment until relieved or given other instructions by the supervisor. Moreover, employees are not allowed to leave the plant without permission because (1) "the employee could get hurt and [Georgia Pacific] might have some liability" and (2) Georgia Pacific does not want to leave equipment running and unattended because this could cause damage to the product and facility.

When Mullins learned of the February 3, 2013, incident, he conducted an investigation which involved interviewing Merrill, Oatney, and Merrill's production

supervisor, John Nordquist. According to Mullins, after hearing Merrill's version of the events he asked Oatney whether he ever gave Merrill permission to leave and Oatney denied giving such an instruction.

Mullins also confirmed with Nordquist that while an employee was authorized to contact Oatney, the maintenance supervisor, for assistance with malfunctioning equipment, any decision to cease operations or leave early should come from the employee's direct supervisor, who, in this case, was Nordquist. Mullins explained that although there was no damage to the equipment, Merrill's actions resulted in a substantial production and material loss because the machines did not operate for several hours although the mechanical problem was an "extremely simple fix." Based on his investigation, Mullins determined it was appropriate to terminate Merrill because she never contacted Nordquist and she did not use the "proper shut down procedure."

Mullins stated that on the day of Merrill's termination he provided her with a disciplinary form entitled Employee Counseling Documentation, in the presence of her union representative, which listed the causes for her discharge. In particular, the Employee Counseling Documentation read as follows:

> "You were previously given a disciplinary lay-off for your continued inefficient operations on the mixer floor. You were disqualified from that position and ultimately moved to the Ultra Operator position effective 9/7/2012. You have continued to display poor quality workmanship and an inability to efficiently perform your duties though provided more than adequate training and opportunity.
> "In the instant case on Saturday, February 2, 2013 into the morning of Sunday, February 3, 2013 you left the plant without authorization of any member of management and additionally, left the equipment running, which was not in accordance with normal shut-down procedures.
> "For the stated behaviors you are now being **'terminated'** according to **Article X (1) Causes for Discharge:** 'Inefficiency continuing after repeated counseling from Foreman, Human Resource Manager or Plant Manager;' **Article X (3)**, 'Insubordination,

6

neglect of duty or disorderly conduct' (leaving the plant without authorization) and **Article X (5),** 'Dishonesty' (misrepresentation of conversation and instructions from supervisor Tobby Oatney to supervisor Nicole Wassenberg)."

Nordquist also provided testimony during this litigation. Although he could not recall whether he was the on-call production supervisor at the time of the incident, Nordquist indicated that Merrill was working alone on the production floor during that shift. As a general matter, Nordquist advised that equipment breaks down at least once a week; and in the event of a breakdown during a graveyard shift, the typical procedure would be for a production employee to contact the production supervisor and, if necessary, that supervisor would contact the maintenance supervisor, who would then decide whether a crew would need to be dispatched. When asked if a production employee is supposed to call the maintenance supervisor directly, Nordquist replied, "Not supposed to, no. But I will say if it's an emergency and you can't get ahold of your production supervisor, then [it] would be proper to get ahold of somebody." Nordquist also testified there is a specific shutdown procedure for the machinery in the Ultra department and the equipment should not be left unattended.

According to Nordquist, Merrill should have contacted the production supervisor, rather than Oatney, when the equipment began to malfunction. When asked, however, if he had ever told Merrill that she needed to call the production supervisor for maintenance issues, he replied, "I don't know that I can say that for a fact." Nordquist acknowledged that Oatney should have known that Merrill was not supposed to call him directly; and when asked if Oatney should have advised Merrill of her error, Nordquist replied, "I would have thought so." Nordquist, however, refused to answer whether Merrill should have followed Oatney's directions, other than to indicate that Merrill should have questioned any directions from Oatney that went beyond contacting her production supervisor.

7

Merrill's discharge was not Georgia Pacific's first attempt to terminate her. Prior to her work injury, on July 3, 2012, Georgia Pacific terminated Merrill for "poor quality workmanship" after she was warned about producing contaminated mixes on the mixing floor. Merrill acknowledged the warning and Georgia Pacific's attempt to terminate her, but she testified that the company reinstated her following a successful union grievance. Upon her reinstatement, Merrill was assigned to "yard help" and later to work in the Densite department. Shortly thereafter, Merrill bid to a position in the Ultra department. According to Merrill, after her disciplinary layoff, she never received any criticism of her job performance nor was she given any poor performance warnings.

Mullins confirmed that in the summer of 2012 he attempted to terminate Merrill because she had "a number of performance issues" on the mixing floor, including "poor quality workmanship and [an] inability to . . . produce at expected rates." After the union filed a grievance on Merrill's behalf, however, Mullins determined it was appropriate to reinstate Merrill and modify her termination to a "disciplinary layoff."

The Division of Workers Compensation held a regular hearing on July 17, 2014. Merrill testified in person to supplement her previous testimony. The administrative law judge (ALJ) also reviewed the deposition transcripts which memorialized the testimony of numerous witnesses. On December 15, 2014, the ALJ awarded Merrill work disability benefits. After determining that Merrill had a functional impairment of at least 10% and a wage loss of 71%, the ALJ addressed Georgia Pacific's contention that Merrill's termination, which Georgia Pacific contended was for cause, disqualified her from receiving a work disability award. In particular, Georgia Pacific argued that under K.S.A. 2012 Supp. 44-510e(a)(2)(E)(i), claimants are ineligible to receive permanent partial disability benefits in excess of their functional impairment if their wage loss was caused by a voluntary resignation or a termination for cause.

The ALJ began her analysis by noting that the Workers Compensation Act (Act), K.S.A. 44-501 *et seq.*, does not define the phrase "termination for cause," nor does the Act provide any standards for determining whether the circumstances surrounding a claimant's firing constitute a termination for cause. The ALJ found, however, that it was "reasonable and logical to use the standards defining discharged for misconduct by the unemployment laws to define termination for a cause." Specifically, the ALJ adopted the definition set forth in K.S.A. 2012 Supp. 44-706(b)(4)(B), which provides that an individual shall not be disqualified from receiving unemployment insurance benefits if his or her discharge occurred under the following circumstances:

> "[T]he individual was making a good-faith effort to do the assigned work but was discharged due to: (i) Inefficiency, (ii) unsatisfactory performance due to inability, incapacity or lack of training or experience, (iii) isolated instances of ordinary negligence or inadvertence, (iv) good-faith errors in judgment or discretion, or (v) unsatisfactory work or conduct due to circumstances beyond the individual's control." K.S.A. 2012 Supp. 44-706(b)(4)(B).

Applying this standard, the ALJ concluded that Merrill was not terminated for cause because she had made a good-faith effort to maintain her employment and properly perform her assigned work duties.

Georgia Pacific appealed this adverse ruling to the Board. The company argued that the ALJ applied an incorrect definition of the phrase "'termination for cause.'" Relying on our court's decision in *Morales-Chavarin v. National Beef Packing Co.*, No. 95,261, 2006 WL 2265205 (Kan. App.) (unpublished opinion), *rev. denied* 282 Kan. 790 (2006), Georgia Pacific contended that the proper standard for such a determination involves deciding "'whether the termination was reasonable, given all of the circumstances.'" Georgia Pacific claimed that under this rubric, Merrill was clearly terminated for cause and "[e]ven if [Merrill] believed she was acting in good faith in doing what she did, that [did] not negate the fact that her actions in leaving the machinery

9

running and unattended created—in the ALJ's words—'an inherently dangerous situation.'" In response, Merrill agreed that *Morales-Chavarin* set forth the appropriate standard of review, but she insisted that the evidence supported the ALJ's ultimate decision.

On May 28, 2015, the Board issued an order on Georgia Pacific's application for review. A majority of three members of the Board affirmed the ALJ's finding that Merrill was fully entitled to a work disability award. Although the majority disagreed with the ALJ's determination that the "employment security law definition of being discharged for misconduct can or should be used to determine termination for cause in workers compensation cases" and agreed with the parties' assertion that *Morales-Chavarin* set forth the appropriate standard for determining whether an employee was discharged for cause, the majority found that Georgia Pacific failed to carry its burden to prove that the company discharged Merrill for cause because its claimed reasons were suspect.

The two remaining Board members dissented. After noting that the ALJ's award "seem[ed] to go so far as to require that a claimant act in bad faith in order to justify the denial of work disability benefits due to a termination for cause," the minority determined that the Act contained no good-faith/bad-faith requirement. According to the minority, Georgia Pacific was not obligated to prove that Merrill acted in bad faith while performing the actions that led to her termination; instead, the Act simply required that "the termination be 'for cause.'" The minority then found that the evidence established that Merrill's termination qualified as a discharge for cause because, as the ALJ acknowledged, Merrill created an "'inherently dangerous situation'" when she left a running piece of equipment unattended and this was not her first disciplinary problem.

Georgia Pacific filed a timely petition for judicial review.

## DID THE WORKERS COMPENSATION BOARD ERR WHEN IT FOUND THAT GEORGIA PACIFIC DID NOT TERMINATE MERRILL FOR CAUSE?

Georgia Pacific contends the Board erred when it awarded Merrill permanent partial disability benefits in excess of her functional impairment because the evidence demonstrates that Merrill's wage loss was entirely attributable to her termination for cause rather than her work-related injury. The company asserts that under K.S.A. 2012 Supp. 44-510e(a)(2)(E)(i), claimants must establish a nexus between their work disability (task loss and wage loss) and injury.

In order to resolve this issue, we must interpret and apply K.S.A. 2012 Supp. 44-510e. We exercise unlimited review over questions involving the interpretation of a statute, owing "'[n]o significant deference'" to the agency's or the Board's interpretation or construction. *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs.*, 290 Kan. 446, 457, 228 P.3d 403 (2010).

Under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.*, which governs our standard of review for workers compensation cases, we review a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported to the appropriate standard of proof by substantial competent evidence. See K.S.A. 2015 Supp. 44-556(a); K.S.A. 2015 Supp. 77-618(a); K.S.A. 2015 Supp. 77-621(c)(7), (d); "[S]ubstantial evidence" refers to evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis of fact from which the issue raised could be easily resolved. *Ward v. Allen County Hospital*, 50 Kan. App. 2d 280, 285, 324 P.3d 1122 (2014). In considering the record as a whole, the court must (1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility

11

determination, if any; and (3) review the agency's explanation as to why the evidence supports its findings. K.S.A. 2015 Supp. 77-621(d); *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014). Our court must not, however, reweigh the evidence or make its own independent review of the facts. K.S.A. 2015 Supp. 77-621(d); *Williams*, 299 Kan. at 795.

Under the Act, the amount of compensation a claimant is entitled to receive depends upon the nature of the claimant's disability. *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 522, 154 P.3d 494 (2007). When, as in this case (December 2012 injury), the claimant sustains a permanent partial disability, the claimant is entitled to compensation under K.S.A. 2012 Supp. 44-510d for a scheduled injury or K.S.A. 2012 Supp. 44-510e for a nonscheduled injury. *Casco*, 283 Kan. at 522. Claimants, like Merrill, who sustain an injury that is not included in the schedule of disabilities, are entitled to a "permanent partial general disability" award. See 283 Kan. at 522. If certain conditions are satisfied, K.S.A. 2012 Supp. 44-510e(a), authorizes claimants to receive permanent partial general disability compensation in excess of their functional impairment, *i.e.*, a work disability award. Work disability awards are calculated in accordance with the formula set forth in K.S.A. 2012 Supp. 44-510e, which, in short, averages the claimant's postinjury wage loss percentage with his or her task loss percentage.

The manner in which Kansas courts have treated a claimant's eligibility for a work disability award in situations involving a wage loss caused by a termination for cause has been in flux over the years. Before addressing the merits of Georgia Pacific's arguments, it is helpful to begin with a brief discussion of this legal history.

Prior to May 15, 2011, K.S.A. 44-510e(a) provided, in pertinent part:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost the ability to

12

perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury. . . . An employee shall not be entitled to receive permanent partial general disability compensation in excess of the percentage of functional impairment as long as the employee is engaging in any work for wages equal to 90% or more of the average gross weekly wage that the employee was earning at the time of the injury."

In the 1990s, our court concluded that K.S.A. 44-510e(a) implicitly contained a requirement that a claimant make a good-faith effort to obtain or retain appropriate employment to mitigate the claimant's wage loss before the claimant could claim entitlement to work disability benefits, as it would be "unreasonable for the courts to conclude the legislature intended to encourage workers to merely sit at home, refuse to work, and take advantage of the workers compensation system." *Copeland v. Johnson Group, Inc.*, 24 Kan. App. 2d 306, 319, 944 P.2d 179 (1997).

Our court also determined that claimants who were terminated for cause were precluded from receiving a work disability award. See, *e.g.*, *Ramirez v. Excel Corp.*, 26 Kan. App. 2d 139, 140-43, 979 P.2d 1261, *rev. denied* 267 Kan. 889 (1999) (claimant was not eligible for a work disability award because the Excel Corporation terminated him for cause, *i.e.*, claimant failed to disclose a prior injury on his employment application); *Minden v. Paola Housing Authority*, No. 100,172, 2009 WL 596559, at *2-6 (Kan. App. 2009) (unpublished opinion) (substantial competent evidence supported the Board's determination that claimant was terminated in good faith, rendering her ineligible for a work disability award).

In 2009, however, our Supreme Court abolished the good-faith requirement in the landmark decision of *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, Syl. ¶ 3, 214 P.3d 676 (2009). Moreover, the court specifically disapproved of all prior cases that

13

imposed such a requirement, including those that involved situations in which the injured employee was terminated for cause. 289 Kan. 605, Syl. ¶ 3.

Subsequently, in *Tyler v. Goodyear Tire & Rubber Co.*, 43 Kan. App. 2d 386, 391, 224 P.3d 1197 (2010), this court eliminated another judicially created requirement when it concluded that K.S.A. 44-510e does not mandate that an injured worker prove a causal connection between his or her wage loss and injury and stated: "Absent a specific statutory provision requiring a nexus between the wage loss and the injury, this court is not to read into the statute such a requirement." See *Killough v. Goodyear Tire & Rubber Co.*, No. 103,321, 2011 WL 2175950, at *4 (Kan. App. 2011) (unpublished opinion). In other words, under K.S.A. 44-510e(a), "[t]he reason for the employee's postinjury wage loss [was] irrelevant." *Criswell v. U.S.D. No. 497*, No. 104,517, 2011 WL 5526549, at *3 (Kan. App. 2011) (unpublished opinion), *rev. denied* 296 Kan. 1129 (2013).

Based upon *Bergstrom* and *Tyler*, our court began upholding a claimant's right to a work disability award in situations where the claimant's wage loss was due to a termination for cause rather than the claimant's injury. See, *e.g.*, *Butler v. Cessna Aircraft Co.*, No. 103,965, 2011 WL 2205238, at *3 (Kan. App. 2011) (unpublished opinion) (claimant eligible for work disability award even where claimant's wage loss was due to termination for cause); *Criswell*, 2011 WL 5526549, at *2 ("Although Criswell makes a compelling argument that allowing claimants who have been terminated for postinjury misconduct to have their awards increased from a functional disability . . . to a work disability places an employer in an untenable situation, our Supreme Court has made it perfectly clear in *Bergstrom* that we are not to read language into a statute that is plain and unambiguous.").

In an apparent response to *Bergstrom*, the legislature amended K.S.A. 44-510e, and among other changes, the amended version of the statute now specifically requires a nexus between the claimant's wage loss and his or her injury. L. 2011, ch. 55, sec. 9.

14

K.S.A. 2012 Supp. 44-510e(a)(2)(C), provides that a claimant may be eligible to receive permanent partial general disability compensation in excess of his or her percentage of functional impairment if the claimant's percentage of functional impairment, determined to be caused solely by the injury, exceeds 7.5% to the body as a whole and the "employee sustained a post-injury wage loss . . . of at least 10% which is *directly attributable to the work injury and not to other causes or factors*." (Emphasis added.) "In such cases, the extent of work disability is determined by averaging together the percentage of post-injury task loss demonstrated by the employee to be caused by the injury and the percentage of post-injury wage loss demonstrated by the employee to be *caused by the injury*." (Emphasis added.) K.S.A. 2012 Supp. 44-510e(a)(2)(C). "'Wage loss'" is defined as "the difference between the average weekly wage the employee was earning at the time of the injury and the average weekly wage the employee is capable of earning after the injury." K.S.A. 2012 Supp. 44-510e(a)(2)(E). Importantly, the legislature also included this language: any "[w]age loss caused by voluntary resignation or *termination for cause shall in no way be construed to be caused by the injury*." (Emphasis added.) K.S.A. 2012 Supp. 44-510e(a)(2)(E)(i).

In amending K.S.A. 44-510e, our legislature did not provide a standard for determining whether a claimant was terminated for cause. But in *Morales-Chavarin v. National Beef Packing Co.*, No. 95,261, 2006 WL 2265205, at *4 (Kan. App.) (unpublished opinion), *rev. denied* 282 Kan. 790 (2006), our court addressed as an issue of first impression, "what constitutes good cause to terminate an employee so as to prohibit an employee from receiving work disability benefits."

In *Morales-Chavarin*, the claimant suffered a repetitive use injury while working for the National Beef Packing Company (National Beef), and the company placed him on a leave of absence because there were no jobs available that accommodated his restrictions. National Beef provided Morales-Chavarin with a form which informed him that his leave ended on April 6, 2004, that prior to that date he must contact National

15

Beef, and that his failure to do so "'may result in discharge.'" 2006 WL 2265205, at *1. National Beef also provided Morales-Chavarin with a Family Medical Leave Act form that explained the leave and gave the expiration date. Morales-Chavarin refused to sign the forms because he did not request the leave and he understood that National Beef no longer had a job available to him.

George Hall, the personnel director for National Beef, testified that he met with Morales-Chavarin when he was placed on leave and informed him that he was required to report to the employer after his doctor's appointment on April 6, 2014. Morales-Chavarin, on the other hand, claimed that he understood he should report any restrictions to National Beef and that he told the personnel office to contact his attorney if they needed to notify him of anything. While Morales-Chavarin admitted that he did not contact National Beef after his doctor's appointment, he provided his attorney with a copy of the doctor's initial report.

National Beef's collective bargaining agreement authorized the discharge of an employee for "overstaying a leave of absence," and on April 21, 2004, National Beef terminated Morales-Chavarin for not reporting back to work. Subsequently, Morales-Chavarin made three attempts to regain his employment, but National Beef refused to rehire him. Notably, Selena Sena, National Beef's workers compensation coordinator, testified that on April 15, 2004, she received the report from Morales-Chavarin's doctor, which stated that he would define the claimant's permanent work restrictions in a later report, which Sena received 4 or 5 days later. Sena conceded that had Morales-Chavarin brought the initial report to National Beef on April 6 his leave would have been extended because the company "could not have done anything else until [it] received [the] . . . permanent restrictions." 2006 WL 2265205, at *2.

When the Board determined that Morales-Chavarin was entitled to a work disability award, National Beef appealed, alleging that Morales-Chavarin's termination

16

for cause disqualified him from receiving the benefits. After reviewing relevant caselaw, our court concluded that the Board's determination that the "proper test [was] whether the claimant made a good faith effort to maintain his employment was incorrect" because "the proper question [was] whether National Beef had good cause to terminate [Morales-Chavarin]." 2006 WL 2265205, at *4.

Our court in *Morales-Chavarin* then undertook the task of defining the proper standard of review. In doing so, the court noted that while discussing the terms "'cause' and 'good cause,'" 2006 WL 2265205, at *5, within an employment contract in *Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 974 P.2d 569 (1999), our Supreme Court referred to *Weir v. Anaconda Co.*, 773 F.2d 1073, 1080 (10th Cir. 1985), which applied Kansas law:

> """[Cause for discharge] is a shortcoming in performance which is detrimental to the discipline or efficiency of the employer. Incompetency or inefficiency or some other cause within the control of the employee which prohibits him from properly completing his task is also included within the definition. A discharge for cause is one which is not arbitrary or capricious, nor is it unjustified or discriminatory."' [Citation omitted.]"
> *Morales-Chavarin*, 2006 WL 2265205, at *5.

Based upon our examination of caselaw, our court concluded in *Morales-Chavarin*, 2006 WL 2265205, at *5. that the "proper inquiry to make when examining whether good cause existed for a termination in a workers compensation case is whether the termination was reasonable, given all of the circumstances," and the panel explained:

> "Included within these circumstances to consider would be whether the claimant made a good faith effort to maintain his or her employment. Whether the employer exercised good faith would also be a consideration. In that regard, the primary focus should be to determine whether the employer's reason for termination is actually a subterfuge to avoid work disability payments." 2006 WL 2265205, at *5.

17

Our court utilized this standard to examine whether Morales-Chavarin's discharge qualified as a termination for cause. First, the court found the record supported the Board's conclusion that Morales-Chavarin acted in good faith because the evidence indicated that he was "confused as to whether he was required to report to National Beef after he was examined by [his doctor] but did not receive [his] restrictions" and he made a diligent attempt to regain his employment. 2006 WL 2265205, at *5-6. Second, the court agreed with the Board's determination that National Beef's failure to contact Morales-Chavarin prior to terminating him qualified as a failure to act in good faith. The panel also found that based upon Sena's testimony the timing of the events further supported this finding. Finally, the panel analyzed the timing of Morales-Chavarin's termination, and the panel concluded that National Beef's reason for termination appeared to be a subterfuge to avoid work disability payments. 2006 WL 2265205, at *6-7.

Returning to the case on appeal, we agree with the parties that the Board did not err when it utilized the standard set forth in *Morales-Chavarin* to determine whether Merrill was terminated for cause. Georgia Pacific, however, claims that the Board erred, as a matter of law, because the majority improperly applied the *Morales-Chavarin* test. That is the next question for our consideration in this appeal.

According to Georgia Pacific, the Board placed too much emphasis upon the good faith of the parties and neglected its obligation to consider the totality of the circumstances. As Merrill counters, however, the majority's discussion of the factual circumstances surrounding her termination are consistent with the *Morales-Chavarin* standard.

In applying the *Morales-Chavarin* standard to the facts of this case, the Board discussed the evidence relevant to its decision:

18

"[J]ust four days prior to the incident that gave rise to [Merrill]'s discharge, an internal email focused on [her] breathing being a safety issue. This fact gives some credence to [her] argument that she was terminated due to her job-induced asthma and not for cause.

. . . .

"Of note, Mr. Mullins agreed that if [Merrill]'s version of events were correct, he would not have terminated her employment, but he opted to believe Mr. Oatney's statement that he did not tell [Merrill] to go home.

"It cannot be stressed enough that the judge believed [Merrill]'s description of events, which was largely uncontroverted. Mr. Oatney did not testify. Written statements attributed to Mr. Oatney, including a write-up and an email, were made part of the record. Such documents do not indicate if he did or did not give [Merrill] permission to go home on February 3, 2013. Mr. Nordquist testified Mr. Oatney should have told [Merrill] to call a production supervisor instead of him. There is no evidence from these documents generated by Mr. Oatney that he told [Merrill] she should not be calling him and instead should have called her production supervisor. From Mr. Oatney's brief statements, these Board Members cannot conclude [Merrill] was dishonest. It is difficult to place much credence in statements Mr. Mullins attributes to Mr. Oatney to the effect that Mr. Oatney never told [Merrill] to go home. No witness even knows the whereabouts of Mr. Oatney.

"While the Board conducts de novo review, the Board nonetheless often opts to give some deference—although not statutorily mandated—to a judge's findings and conclusions concerning credibility where the judge was able to observe the testimony in person. The judge had the first-hand opportunity to assess [Merrill]'s testimony. . . . [T]he judge made a credibility ruling in [Merrill]'s favor. The judge did not adopt [Georgia Pacific]'s asserted version [of] what transpired as true. . . .

"Other evidence of what [Merrill] did prior to her work accident does not sufficiently justify [Merrill]'s termination. In [July] 2012, prior to her accident, [Merrill] was terminated based on inefficiency. After a union grievance, her termination was rescinded . . . after [Mullins] determined she may not have had the appropriate training. It seems unfair to use [Merrill]'s prior termination to justify her subsequent termination when it turned out [Georgia Pacific] agreed such prior termination was unwarranted.

. . . .

"[Georgia Pacific] asserts [Merrill] had been previously written up numerous times for inadequately performing her job as a mixer. . . . [Mullins] did not counsel her after she was reinstated and given the job in the Ultra department. Mr. Nordquist testified

19

he had issues with [Merrill] when she did the mixer job, but nothing else until the event leading to [Merrill]'s termination. Mr. Nordquist did not know if he ever gave [Merrill] any sort of warning or disciplinary action, but if he had, [Georgia Pacific] should have had a copy of any verbal or written reprimand. No such documentation was in the evidentiary record. From late June 2012 until she was discharged, [Merrill] received no write-ups. From August 2012 until her February 5, 2013, termination, [Merrill] was not cited for inefficiency, insubordination, neglect of duty or dishonesty. [Merrill] testified that prior to February 5, 2013, when she was discharged, she had not received any criticism of her job performance in the Ultra department."

As summarized above, in applying the *Morales-Chavarin* standard, the Board thoroughly considered Merrill's work and disciplinary history, her work injury of December 18, 2012, the work incident of February 3, 2013, and Georgia Pacific's handling of both Merrill's injury and her termination following the work incident. As detailed in the Board's opinion, it is apparent the majority considered the totality of circumstances as required in utilizing the *Morales-Chavarin* standard.

We are persuaded that the Board properly applied the correct standard of review and there was sufficient substantial competent evidence to support its determination that Merrill was not terminated for cause. In addition, similar to *Morales-Chavarin*, we find support for the Board's belief that the reasons Georgia Pacific provided for Merrill's termination were pretextual in order to avoid providing Merrill work disability payments. In particular, there are three reasons, supported by evidence, which justify the propriety of the Board's conclusion.

First, Mullins claimed that Merrill was terminated for inefficiency following repeated counseling. Yet, he also testified that while she received counseling during her stint as a mixer, she received no further counseling following her disciplinary layoff. Similarly, when asked if Merrill was a "satisfactory employee" as far as he was concerned, Nordquist replied, "We had had some issues when she was in [U]ltra and that

20

process of trying to figure out whether we had an issue with the equipment or whether it was an issue with the employee making a mistake. I don't know that it was ever completely determined." Moreover, Nordquist could not recall whether he ever gave Merrill "any kind of a warning or disciplinary action." In sum, Georgia Pacific's claim that Merrill was terminated for inefficiency lacked a sufficient factual basis.

Second, Georgia Pacific's claims that Merrill was terminated because she was insubordinate and neglected her job duties focused on the company's version of Merrill's conduct during the February 3, 2013, equipment malfunction. Yet, Georgia Pacific's version was highly controverted by Merrill's testimony. And based on the following discussion between Mullins and Merrill's attorney, it is apparent that Merrill's termination was predicated on Oatney's assertion that he did not tell Merrill that she could leave her shift early.

> "[MERRILL'S ATTORNEY:]  If the instruction she was given [was] to contact . . . Oatney, and she was given his home phone number to do so, and she did contact him four times, and he did give her instructions each time, and he never told her, 'no, you're calling the wrong person. You need to call John Nordquist or somebody else.' Should she have disregarded what he told her to do?
> "[MULLINS:]  Well, I would say if he had actually told her to go home, she probably would have been on firm ground. I wouldn't have terminated her. But the reality is [Oatney] clearly stated to me that he did not give her that instruction. So—since he didn't give her those instructions, she had no business leaving.
> "[MERRILL'S ATTORNEY:]  I understand what you're saying. That the boss said I didn't say that, she says he did, but you are saying that had the boss told her to go home, shut it down and go home, then she should have done what he told her?
> "[MULLINS:]  If the boss had given her those instructions, absolutely, she should follow the instructions she was given."

While Mullins indicated that Merrill's termination was essentially premised upon Oatney's claim that he never told Merrill she could abandon her shift, Oatney did not

testify at the regular hearing, nor was he deposed. Mullins conceded that Oatney was terminated for "excess absenteeism," and neither Mullins nor Nordquist had any idea of Oatney's whereabouts. In fact, Nordquist testified that he did not know why Oatney left, and while he believed Oatney left "[n]ot too long after [Merrill]," he did not "know [that] for a fact." Moreover, Mullins indicated that a copy of Oatney's written statement concerning Merrill's termination confirmed his assertion that he did not advise Merrill to leave her shift early. But as the Board found, Oatney's written statement does not address whether he told Merrill to leave. Likewise, another witness spoke with Merrill and Oatney after Merrill's graveyard shift, and the written statement she prepared is also silent on this important issue.

As the Board properly found: "The judge had the first-hand opportunity to assess [Merrill]'s testimony. . . . [T]he judge made a credibility ruling in [Merrill]'s favor." Merrill's testimony directly controverted the testimony of company employees who spoke with Oatney. We may not challenge the ALJ's credibility finding which is supported by the evidence. Given that the ALJ found Merrill's version of the February 3, 2013, equipment malfunction was true, there is substantial competent evidence to discount Georgia Pacific's account based on hearsay from employees who spoke with Oatney.

Finally, as the Board aptly pointed out, an internal email sent a few days prior to Merrill's termination "gives some credence to [Merrill]'s argument that she was terminated due to her job-induced asthma and not for cause." On January 30, 2013, Donnie Stein sent Mullins an email which stated, "Still piling up. See below." The "[s]ee below" reference pertained to an email Stein received from Michael J. Lyhane, which read:

> "Deanna called over a little while ago stating material was coming out of a tube it wasn't supposed to. I went over and it was just an overflow tube after the Sweco screen. I remained calm, didn't even increase my walk to anything to be considered 'brisk.' I told

22

her I wasn't too worried about it at this time. She then tried to fire up the reheater and couldn't get any material to flow. She started to 'hyperventilate' (I am not a doctor, and that is not a diagnosis) and used her Inhaler. We went to the control room and reviewed the screen and everything seemed to be set right. I went and got [illegible] to come over. By the time he got over there, DeAnna had called Denny and he came over and got Ultra running, there was a switch after the Air Seperator [*sic*] that was in the opposite direction it was supposed to be.

"#1—I believe this is another example of DeAnna not being able to trouble shoot her machinery. I believe this is the third consecutive time that she has been unable to make the change to from white to dirt or vice versa on her own. Thus furthering the question of whether she should be qualified to operate the Ultra department.

"#2—*Her sudden onset of breathing issues when there is a disruption of any sort to the normal process leads me to believe that her presence is a safety issue. If there were to be an issue while an autoclave is open or basket raised and her condition gets agitated we could be looking at disastrous results. I do not believe that for her own safety and the safety of others on the property that could be affected, that she be allowed to work in any form of solitary condition without anyone that can make sure she does not have an attack that her Inhaler doesn't get under control.*" (Emphasis added.)

The Board was persuaded that the timing of this email referencing Merrill's health problems and resultant safety concerns shortly before her termination strongly suggested that these were the actual reasons for Merrill's termination—not inefficiency, insubordination, and dishonesty.

In conclusion, when viewed in light of the record as a whole and applying the *Morales-Chavarin* standard in evaluating whether Merrill was terminated for good cause, we hold that substantial competent evidence supports the Board's finding that Georgia Pacific did not terminate Merrill for cause.

Affirmed.

23